482 S.E.2d 913

**Lonnie COLE, Administrator of the Estate of Stephen Brant Cole II, Plaintiff Below, Appellee**

v.

**Jack Douglas FAIRCHILD, Jr., Defendant Below, Appellee,**

**Flat Top Lake Association, a West Virginia Corporation, Defendant and Third–Party Plaintiff Below, Appellant,**

**Myrleen B. Fairchild, Executrix of the Estate of Jack R. Fairchild, Intervenor Third–Party Defendant Below, Appellee.**

**Lonnie COLE, Administrator of the Estate of Stephen Brant Cole II, Plaintiff Below, Appellant**

v.

**Jack Douglas FAIRCHILD, Jr., Defendant Below, Appellee,**

and

**Flat Top Lake Association, a West Virginia Corporation, Defendant and Third–Party Plaintiff Below, Appellee.**

**Nos. 23081, 23111.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 17, 1996.

Decided Dec. 20, 1996.

---

Michael E. Froble and John D. Wooton, Wooton, Wooton & Fragile, Beckley, for Lonnie Cole.

James R. Sheatsley, Gorman, Sheatsley & Company, L.C., Beckley, for Jack Douglas Fairchild, Jr.

Gary E. Pullin and Scott D. Maddox, Pullin, Knopf, Fowler & Flanagan, Charleston, for Flat Top Lake Association.

James M. Brown and Jane E. Harkins, Brown & Levicoff, Beckley, for Myrleen B. Fairchild.

WORKMAN, Justice:

Although the two appeals [1] addressed in this opinion involve different assignments of error, we consolidated these actions because they arise from the same set of facts litigated in a single trial. On March 31, 1995, a jury verdict was returned for the wrongful death of Stephen Brant Cole, II, (hereinafter Stephen), in favor of the plaintiff below, Lonnie Cole (hereinafter Mr. Cole), Administrator of the Estate of Stephen Brant Cole II, awarding $6,398.98 for stipulated medical and funeral expenses and $88,000 for sorrow, mental anguish, and solace, totaling $94,398.98.

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

The jury awarded no damages for projected lost income or for loss of services, protection, care, and assistance. The jury also assessed 80% of the negligence against Flat Top Lake Association (hereinafter Flat Top), a defendant below, and 20% of the negligence against Jack Douglas Fairchild, Jr., (hereinafter Fairchild, Jr.), also a defendant below.

I.

FACTS

On July 28, 1991, six-year-old Stephen was killed in a motorcycle accident on property owned by Flat Top. Stephen was invited to go motorcycle riding that day by Fairchild, Jr., who had taken Stephen to Flat Top to ride motorcycles on other occasions. Stephen was given permission to go either by his mother, Diane Lilly (hereinafter Stephen's mother), his father, Stephen B. Cole, Sr., (hereinafter Stephen's father), and/or his paternal grandparents, Mr. Cole and his wife, Ginger Cole.

At the time of the accident, Stephen's parents were divorced, and Stephen's father lived with his parents, Mr. and Mrs. Cole.[2] As a result of this situation, Stephen spent a significant amount of time at his paternal grandparents' house located in Beckley, West Virginia. The Coles were neighbors with Fairchild, Jr., and, according to Fairchild, Jr., Stephen and his son, Justin, frequently would play together on weekends when Stephen was at his grandparents' house.

Stephen's father testified he taught Stephen to ride a motorcycle when Stephen was around five years old, and he believed Stephen was a pretty good rider. In addition, Stephen's mother and stepfather, Ken Lilly, purchased a motorcycle for Stephen which they kept at their house. Stephen also rode an "Indian" model motorcycle which belonged to Fairchild, Jr., but was repaired by Stephen's father and stored at the Mr. Coles' house. Before Stephen left to go motorcycle riding on the day of the accident, his mother dropped off his boots and a motorcycle helmet at the Cole residence. However, she did not bring Stephen's chest protection equipment. Flat Top states the trial court improperly excluded evidence that Stephen was not wearing his chest protection equipment when the accident occurred because his mother failed to drop it off with the other equipment. According to the report filed by the Office of the West Virginia Medical Examiner, Stephen died of chest injuries.

On the day of the accident, Fairchild, Jr., took his two sons, Jeremy and Justin; Stephen; and his brother-in-law, Robert Douglas Meador to Flat Top. The accident occurred when the group was motorcycle riding on an area of property owned by Flat Top referred to as the "upper field" and "upper track." Fairchild, Jr., testified that he stayed in front of Justin and Stephen as they rode the motorcycles around the upper track and he taught them to ride in a clockwise direction.[3] At some point, all five members of the group stopped at the entrance to the upper track and Fairchild, Jr., began talking to Gene Kessler.

At the time of trial, Mr. Kessler had worked as a conservator/superintendent at Flat Top for the past fourteen years.[4] While Fairchild, Jr., and Mr. Kessler were talking, Mr. Kessler noticed that Jeremy rode one of the motorcycles toward an area known as the "big field," but Jeremy then returned to the upper track and began traveling in a counterclockwise direction. In the meantime, Mr. Kessler observed that Stephen took off in a clockwise direction around the upper track with Mr. Meador following behind him. Mr. Kessler said that Fairchild, Jr., "kind of yelled out to [Jeremy], but he didn't hear or

---

**2.** As indicated above, Mr. Cole brought the underlying action as the Administrator of the Stephen's Estate.

**3.** Jack Douglas Fairchild, Jr., explained there was not a rule to go one direction or the other, but "it was for safety factors to go clockwise" because on "the left side of the track is a small,

upgrade hill and to come down that direction could build speed . . . ."

**4.** Mr. Kessler was employed through the Raleigh County Commission.

anything." As they "went around the upper turns" of the track, Mr. Meador testified that Jeremy and Stephen collided at a point where high grass caused a "blind spot." Mr. Meador said the grass was about four to four and one-half feet high and over Stephen's head. At the point of the accident, Mr. Meador described the upper track to be approximately eight feet wide. Several experts testified on behalf of the parties generally with regard to the condition of the property, the high grass, and the suitability of the areas for motorcycle riding.

## II.

## DISCUSSION

### A.

### Standard of Review

Many issues presented in this case involve mixed questions of facts and law. Resolving these mixed questions entails merging "fact-finding with an elucidation of the applicable law." *Fraternal Order of Police v. Fairmont*, 196 W.Va. 97, 100 n. 3, 468 S.E.2d 712, 715 n. 3 (1996). Ordinarily, we review a resolution of mixed questions "along the degree-of-deference continuum...." *Id.* When a question is more dominated by facts, the more apt we are to accept the trier of fact's resolution of the matter, unless the decision is clearly erroneous. *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 106, 459 S.E.2d 374, 383 (1995). Ostensible "findings of fact," however, are subject to de novo review when they involve applying the law or making legal judgments which exceed ordinary factual determinations. *Appalachian Power Co. v. State Tax Dept. of West*

*Virginia,* 195 W.Va. 573, 582 n. 5, 466 S.E.2d 424, 432 n. 5 (1995). Moreover, when we are presented with an interrelationship between factual and legal conclusions, our review is plenary. *Id.* Therefore, we proceed to address the merits of this case applying these principles.

### B.

### Status of Child and Duty of Flat Top

The first issue we address is whether Stephen was a licensee or a business invitee for purposes of determining the duty of care Flat Top owed him.[5] Flat Top moved for summary judgment based upon its belief Stephen was a licensee to whom it breached no duty. However, when the issue was raised at trial, the trial court determined Stephen was a business invitee when the accident occurred, stating the recreational facilities provided to Flat Top members and guests are for "economic benefit," not charity. After careful review of the record, we conclude the trial court's ultimate determination was clearly erroneous with respect to Stephen being a business invitee.[6]

"We have consistently recognized and applied the distinctions for liability purposes among trespassers, licensees and invitees." Syl. Pt. 1, *Miller v. Monongahela Power Co.*, 184 W.Va. 663, 403 S.E.2d 406, *cert. denied* 502 U.S. 863, 112 S.Ct. 186, 116 L.Ed.2d 147 (1991). We have said "[a] person is an invitee when for purposes connected with the business conducted on the premises he enters or uses a place of business." Syl. Pt. 2, *Puffer v. Hub Cigar Store, Inc.*, 140 W.Va. 327, 84 S.E.2d 145 (1954).[7] However, a person is a licensee when he or she has permis-

---

**5.** We find no merit to Flat Top's assertion in its brief that Stephen was "quite possibly a trespasser."

**6.** This issue was not presented to the jury, rather the parties agreed to let the trial court judge decide the matter.

**7.** For purposes of this opinion, our references to "invitee" are made with respect to the trial court's conclusion that Stephen was a "business

invitee." Another type of invitee is a "public invitee." "A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public." Restatement (Second) on Torts § 332(2) at 176 (1965). Under the present facts, we find it clear that Stephen does not qualify as a "public invitee." Flat Top property is set aside exclusively for use by its members and guests, and the general public is not welcome to use its facilities or property.

sion or consent to " 'enter[ ] the premises of another, not in response to any inducement offered by the owner or occupant, or for a purpose having some connection with a business actually or apparently carried on there by the occupant, but for his own mere pleasure, convenience, or benefit.' " *McMillion v. Selman*, 193 W.Va. 301, 303, 456 S.E.2d 28, 30 (1995) (quoting 62 Am.Jur.2d *Premise Liability* § 91 (1990)). Thus, when determining whether someone falls within the category of invitee or licensee, it is necessary to examine the purpose of the visit. *Id.* at 304, 456 S.E.2d at 31. Additionally, it also is important to recognize the distinction between an "invitation" to enter upon the premises and mere "permission" to enter upon the premises.

An "invitation" occurs when a possessor of certain premises exhibits conduct which makes others believe the possessor wants them to be on the premises. Restatement (Second) on Torts § 332, cmt. b at 176–77 (1965). In other words, as we explained in *Waddell v. New River Co.*, 141 W.Va. 880, 93 S.E.2d 473 (1956):

> Likewise, we find for purposes of this case, Flat Top was not a "public" recreational area under the provisions contained in West Virginia Code § 19–25–1 to –7 (1993 & Supp.1996) (limiting duties and liability of landowners who permit the public to use their land and water areas for recreational, wildlife propagation, or military training purposes); *see generally Stamper by Stamper v. Kanawha County Bd. of Educ.*, 191 W.Va. 297, 445 S.E.2d 238 (1994) (referencing Model Act and holding in syllabus point three that these provisions are "not designed to cover real property owned by a county board of education"); 24 Suggested State Legislation, *Public Recreation on Private Lands: Limitation on Liability* 150 (1965) (providing in introduction to Model Act that it "is designed to encourage" private landowners "to make their land available to members of the general public without charge" to meet the "need for additional recreational areas to serve the general public").
>
> In a similar case as the present one, the Supreme Court of Wisconsin found under its recreational use act that a pier on a lake, which was jointly owned, kept, and maintained by six landowners, was not open to the general public and permission was not given "to one or more members of the 'public' to use the land for recreational purposes." *LePoidevin by Dye v. Wilson*, 111 Wis.2d 116, 330 N.W.2d 555, 557 & 563 (1983). An action arose when a seventeen-year-old girl dove off a pier and suffered injuries. The girl

[An] invitation is the act of one who solicits or incites others to enter upon, remain in, or make use of, his property or structures thereon, or who so arranges the property or the means of access to it or of transit over it as to induce the reasonable belief that he expects and intends that others shall come upon it or pass over it.

*Id.* at 883, 93 S.E.2d at 476. On the other hand, "permission" indicates the possessor of the premises will allow an individual to be on the premises if the individual so desires. Restatement (Second) on Torts § 332, cmt. b at 176–77.

An invitation, by itself, will not establish a person as an invitee. For example, a social guest, although invited, generally is considered a licensee, not an invitee. *See* Syl. Pt. 9, *Jack v. Fritts*, 193 W.Va. 494, 457 S.E.2d 431 (1995) (providing "[s]ince a tenant's social guest is nothing more than a licensee, a landlord owes only the minimal duty of refraining from willfully or wantonly injuring the licensee"). However, to be considered an invitee there must be an invita-

> was invited onto the property by the son of one of the landowners. *Id.* at 557. The court ruled that granting recreational use act protection "to a landowner who invites a friend of the family to the summer cottage as a guest to join the family in water sports does not foster the purpose of . . . [the recreational use act] to encourage landowners to make land and water areas available to the public for recreational use." *Id.* at 563.
>
> We acknowledge, as did the Wisconsin court, "it is difficult to draw a bright line between a landowner who grants permission to persons to use the premises for recreational purposes . . . [under the recreational use act] and a landowner who invites a person to use the premises for recreational purposes and is not protected by . . . [the act]." *Id.; see also* Robin C. Miller, Annotation, *Effect of Statute Limiting Landowner's Liability for Personal Injury to Recreational User*, 47 A.L.R.4th 262 (1986). However, for purposes of this case, clearly Flat Top was not being used as a "public" recreational area. As a result of this finding, we make no determinations as to whether Flat Top otherwise meets the criteria for limited liability under West Virginia Code §§ 19–25–1 to –7. Moreover, we also expressly make no comment whether Flat Top previously acted, currently acts, or eventually will act as a "public" recreational area under facts different from this case.

tion. Restatement (Second) on Torts § 332, cmt. b at 176. In addition, permission will not confer upon a visitor the status of an invitee, but it will confer the status of a licensee. *Id.* at 177; *see also* 62 Am.Jur.2d *Premise Liability* § 95 (1990).

In *Turpin v. Our Lady of Mercy Catholic Church,* 20 N.C.App. 580, 202 S.E.2d 351 (1974), a North Carolina appellate court distinguished these two concepts in a civil injury case brought by a basketball player who was hurt in a church gym. The evidence demonstrated that the gym was not open to the general public but, on occasions, the church permitted the gym to be used by nonmembers. *Id.* at 352. The plaintiff in the case was not a member of the church, but he played on a team which was allowed to practice in the gym. *Id.* The trial court granted summary judgment in favor of the church, and the appellate court affirmed. *Id.* at 352–53. The appellate court found the church merely gave the team permission, not an invitation, to use the gym as there was no mutuality of benefit between the plaintiff and the church. Therefore, the appellate court determined the plaintiff was a social guest, holding the status of a licensee. *Id.* at 352.

■ The significance of being a licensee rather than an invitee goes directly to the duty of care owed that person. In the syllabus of *Hamilton v. Brown,* 157 W.Va. 910, 207 S.E.2d 923 (1974), we characterized a licensee and the duty owed a licensee in the following way:

> Mere permissive use of the premises, by express or implied authority ordinarily creates only a license, and as to a licensee, the law does not impose upon the owner of the property an obligation to provide against dangers which arise out of the existing condition of the premises inasmuch as the licensee goes upon the premises subject to all the dangers attending such conditions.

*Quoted in Miller,* 184 W.Va. at 667–68, 403 S.E.2d at 410–11. Furthermore, it is generally stated that the duty owed to a licensee simply is to refrain from committing wilful or wanton injuries. *Atkinson v. Harman,* 151 W.Va. 1025, 1031, 158 S.E.2d 169, 174 (1967) (quoting 65 C.J.S. *Negligence* § 63(32) at 692 (1966)).

To the contrary, a much higher duty is owed to an invitee. Ordinarily, a possessor of property must keep the premises in a reasonably safe condition for an invitee. Syl. Pt. 2, *Burdette v. Burdette,* 147 W.Va. 313, 127 S.E.2d 249 (1962); *accord* Syl. Pt. 4, *Puffer* (providing, in part, "[t]he owner or the occupant of premises owes to an invited person the duty to exercise ordinary care to keep and maintain the premises in a reasonably safe condition"). Moreover, if a possessor of a premise "is not guilty of negligence or willful or wanton misconduct and no nuisance exists, he is not liable for injuries there sustained by such invited person." Syl. Pt. 3, *Puffer,* in part.

■ Turning to the present case, the trial court inferred from the facts that Stephen was a business invitee when he was riding the motorcycle upon Flat Top's property. We find this conclusion is clearly erroneous. By pretrial order dated March 15, 1995, the parties stipulated that Flat Top "is a homeowners' association for persons who own real property at Flat Top Lake." Flat Top also "owns certain real property and recreational facilities ... surrounding Flat Top Lake to which the homeowners in the association have access by virtue of their membership in the Association. Access to the homes ... and to the Lake area is restricted and controlled by rules of the Association." According to Flat Top's handbook, dated April 5, 1990, the original purpose of this organization was to provide recreational opportunities exclusively to benefit its members. The handbook further provides such recreational opportunities include tennis courts, playground equipment, a softball field, a basketball court, and a man-made lake for water activities, such as boating, fishing, and swimming. However, it equally is clear from the handbook that, in reality, Flat Top does more than just provide recreational opportunities for its members. Among other things for instance, as a homeowners' association, it maintains the perimeter road which provides

access to the residential houses around the lake. In addition, it maintains the Flat Top's property and regulates the way homeowners may develop and maintain their privately owned property.

According to Mr. Kessler, Flat Top's property consists of approximately 2,200 acres, including about a 258–acre lake. There are 374 lots surrounding the lake with around 272 seasonal and full-time houses located thereon. Mr. Kessler estimated that about 1,800 acres of Flat Top's property extends beyond the perimeter road. He stated this area is mainly woodland and fire trails, but he said it also contains some fields and maintenance buildings. Mr. Kessler also mentioned that all members of Flat Top can use this property for things like hiking, camping, riding motorcycles, and riding four-wheelers.[8] Moreover, the area of the upper field where Stephen died was used by members and guests of Flat Top for motorcycle riding and other recreational activities.

At the time of trial, the president of Flat Top was Constance Duffy Woods. Ms. Woods testified the area is restricted from the general public by a gate system. To enter the premises, one must have a card to raise the gate, be admitted by a member via a phone system, or be on a standing guest list. Guards are posted at the gate on Saturdays, Sundays, and holidays to admit guests on the list. Ms. Woods explained that to be a member of Flat Top one must first apply for membership and, if accepted, must purchase property usually within thirty days. According to Ms. Woods, members in good standing and their guests are entitled to use Flat Top's recreational areas. To be in good standing, members are required to pay annual dues and assessments.

When the status of Stephen was being debated at trial, the trial court deemed the property as a "recreational subdivision." In addition, the trial court stated it is reasonable to conclude that people buy lots along the lake and become members of Flat Top because of the recreational areas. By allowing members to bring guests onto the property and use the facilities, the trial court found it enhances the value of the membership. Therefore, the trial court concluded this "economic benefit" to Flat Top makes Stephen an invitee "because the business of ... [Flat Top] is recreation and the child was there, not just passing through, but he was there because of the way in which they set this up in which members could have guests as a part of their membership rights." We agree with the trial court that people may buy lots at Flat Top to use the recreational areas, however, we find the "economic benefit" gained by Flat Top, if any, by permitting guests to use the facilities is much too tenuous to declare Stephen a business invitee.

Applying the aforementioned legal principles to the present facts, we find Stephen clearly was a social guest. First, it is obvious that this six-year-old child did not enter upon the property to conduct business in any way. He was there to ride a motorcycle for "his own mere pleasure, convenience, or benefit.'" *McMillion*, 193 W.Va. at 303, 456 S.E.2d at 30 (citation omitted). In addition, although Flat Top "permits" its members to "invite" guests to use the recreational areas, there must be some underlying business purpose, to elevate Stephen from a mere social guest to a business invitee.

Upon review of the facts, we find it extremely dubious that this homeowners' association permits guests to use the recreational areas so the homeowner's can derive an "economic benefit" by increasing the value of Flat Top membership. In fact, we do not see any evidence which causes us to believe Flat Top or its members either explicitly or implicitly solicited or enticed young Stephen to make use of its premises for its economic gain. There simply is no mutuality of benefit in this case. We find Stephen's presence on the property was purely a gratuitous act and, a fortiori, Stephen is a licensee. Conse-

---

**8.** Mr. Kessler asserted there are some areas where vehicles are not permitted, but those areas are not at issue in this case.

quently, Flat Top generally owes Stephen a duty to refrain from committing wilful or wanton injuries.[9] *Atkinson*, 151 W.Va. at 1031, 158 S.E.2d at 174. However, it does not owe Stephen a duty to protect him "against dangers which arise out of the existing condition of the premises inasmuch as the licensee goes upon the premises subject to all the dangers attending such conditions." Syllabus, *Hamilton.*

We make no finding whether Flat Top violated the threshold of this lower duty owed to Stephen. Instead, we believe the interests of justice require giving Mr. Cole the opportunity on remand to argue Flat Top failed to meet even this duty of care. If Flat Top renews its motion for summary judgment with proper support and affirmative evidence establishing "no genuine issue of material fact" exists, the nonmoving parties will have the burden to "either (1) rehabilitate the evidence attacked by . . . [Flat Top], (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure."[10] Syl. Pt. 3, in part, *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329 (1995); *see also* Syl. Pt. 2, *Gentry v. Mangum*, 195 W.Va. 512, 518–19, 466 S.E.2d 171, 177–78 (1995) (explaining further the criteria for summary judgment). Thereafter, the trial court must ascertain whether, "from the totality of the evidence presented,

the record could not lead a rational trier of fact to find for the nonmoving part[ies]." Syl. Pt. 2, in part, *Williams.* When viewed in a light most favorable to the nonmoving parties, summary judgment is required if the trial court finds no trialworthy issue exists. *Id.* at 60, 459 S.E.2d at 337.

### C.

### *Motion for Summary Judgment in Favor of Myrleen B. Fairchild*

To further complicate this case, it is undisputed that Fairchild, Jr., who took Stephen motorcycle riding on Flat Top property, was neither a property owner nor member of Flat Top at the time the accident occurred. However, his father, Jack R. Fairchild (hereinafter referred to as Fairchild, Sr.),[11] now deceased, owned three lots along the lake and was a member. Fairchild, Sr., gave Fairchild, Jr., a gate card so Fairchild, Jr., always would have access to his parents' house.

As a result of the lawsuit brought by Mr. Cole, Flat Top instituted an action as a third-party plaintiff against Myrleen B. Fairchild, the widow of Fairchild, Sr., and the Executrix of his estate (hereinafter referred to as Mrs. Fairchild). Flat Top generally bases its claim against Mrs. Fairchild on an indemnity theory, alleging an indemnity contract was created by the rules and regulations in its handbook, and an agency theory, asserting Fairchild, Jr., was exercising the member-

---

**9.** We note, however, that application of the wilful, wanton, and reckless standard with respect to the duty owed to a six-year-old child may result in a different conclusion than if this standard is applied to an adult. Moreover, we find Fairchild, Jr., may be held to a higher standard if he is the one found to be directly responsible for Stephen's care while at Flat Top. As stated in *Laite v. Baxter*, 126 Ga.App. 743, 191 S.E.2d 531 (1972):

"'As a general rule, a person who undertakes the control and supervision of a child, even without compensation, has the duty to use reasonable care to protect the child from injury. Such person is not an insurer of the safety of the child. He is required only to use reasonable care commensurate with the reasonably foreseeable risks of harm.'"

*Id.* at 534 (quoting *Whitney v. Southern Farm Bureau Cas. Ins. Co.*, 225 So.2d 30, 33 (La.App.

1969); *see also Standifer v. Pate*, 291 Ala. 434, 282 So.2d 261, 265 (1973) (finding "defendant's duty to exercise due care arises, not out of the parties' relationship of land occupier and licensee or invitee, but rather, out of the duty to exercise due care assumed by a babysitter toward his infant charge"); Restatement (Second) on Torts § 320.

**10.** Motions for summary judgment may be made pursuant to Rule 56 of the West Virginia Rules of Civil Procedure.

**11.** We are aware that Jack R. Fairchild is not designated as "Sr." in the style of this case; however, we use this reference to distinguish these two Fairchilds in the text of this opinion.

ship rights of his father when Fairchild, Jr., invited Stephen to go motorcycle riding at Flat Top. Thereafter, Mrs. Fairchild made a motion for summary judgment which was granted by the trial court by order dated March 14, 1995. In its order, the trial court found the by-laws, rules, and regulations of Flat Top did not give rise to a cause of action against Fairchild, Sr., for the alleged negligence of Fairchild, Jr., who was on the property as a guest. Additionally, because Fairchild, Jr., was a social guest, he was not an agent of his father when the negligent act occurred. Both Flat Top and Fairchild, Jr., assert the trial court erred by granting the motion.

■ Our review of summary judgment is de novo. Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Additionally, we apply the same standards that a trial court uses, as announced above in part II(B), *supra*, for our determination whether summary judgment was proper. *See Payne v. Weston*, 195 W.Va. 502, 506, 466 S.E.2d 161, 165 (1995). Based upon such review, we find no merit to Flat Top's indemnity theory and make short shrift of this argument.[12] However, we believe the agency theory warrants discussion. Therefore, we proceed to address this issue.

■ We set forth some general principles of agency law in syllabus points two and three of *Teter v. Old Colony Co.*, 190 W.Va. 711, 441 S.E.2d 728 (1994), where we said:

2. "'An agent in the restricted and proper sense is a representative of his principal in business or contractual rela-

tions with third persons; while a servant or employee is one engaged, not in creating contractual obligations, but in rendering service, chiefly with reference to things but sometimes with reference to persons when no contractual obligation is to result.' Syllabus Point 3, *State, ex rel. Key v. Bond*, 94 W.Va. 255, 118 S.E. 276 (1923)."

3. "One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent."

In a broader sense, agency means a "fiduciary relation[ship] which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 at 7 (1957). Moreover, we have held that if an agent "is acting within the scope of his employment, then his principal ... may ... be held liable." Syl. Pt. 3, *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981).

■ Looking at the facts of the present case in a light most favorable to the nonmoving parties, we find it could be said that Fairchild, Sr., conveyed express or implied authority to Fairchild, Jr., to invite other social guests to use Flat Top property by virtue of Fairchild, Sr.'s, membership rights. In a pretrial memorandum submitted on behalf of Mrs. Fairchild, she agrees that Fairchild, Jr., was given a gate card to access Flat Top property. Additionally, Mrs. Fairchild admits Stephen accompanied Fairchild, Jr., on four or five other occasions to ride

---

12. After reviewing the handbook, we can find no specific mention of indemnity. In its brief, Flat Top primarily relies upon one sentence contained in section "VIII. General," paragraph D, to support its position. This paragraph states: "Members of the Association will be responsible for the conduct of their guests." We stated in syllabus point three of *Sellers v. Owens–Illinois Glass Co.*, 156 W.Va. 87, 191 S.E.2d 166 (1972), that "[g]enerally, contracts will not be construed to indemnify one against his own negligence, unless such intention is expressed in clear and definite language." In addition, we have said when "'a court properly determines that the contract is unambiguous on the dispositive issue,

it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.'" *Williams*, 194 W.Va. at 66 n. 26, 459 S.E.2d at 343 n. 26 (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993). In light of our holding in syllabus point three of *Sellers*, we find the trial court properly found as a matter of law that this provision is insufficient to present a genuine issue as to whether an indemnity relationship exists between Flat Top and its members.

motorcycles at Flat Top prior to the day of the accident and, on the day of the accident, Fairchild, Jr., called her and said he was bringing his sons, Stephen, and Mr. Meador out to Flat Top.

The parties opposed to Mrs. Fairchild's motion assert, Fairchild, Sr., had control over Fairchild, Jr.'s, authority to invite other social guests because Fairchild, Jr.'s, authority existed solely under the auspice of Fairchild, Sr.'s, membership rights. Thus, Fairchild, Sr., simply could have terminated Fairchild, Jr.'s, privileges. For these reasons, the opponents to the motion for summary judgment claim Fairchild, Jr., acted as an agent of Fairchild, Sr., when Fairchild, Jr., would bring other social guests with him to Flat Top.

The agency theory advanced in this case is a novel one for this Court. The parties do not cite any cases from other jurisdictions directly on point with the facts of this case, nor can we find any cases directly on point. Even if we assume Fairchild, Jr., was acting under the authority and control of his father, the question remains whether this situation is the type that falls within the realm of agency law and may bind a person for the alleged negligent acts of another.

In many respects, this case is very atypical because Stephen was not a business invitee of Flat Top and his presence on the property as a social guest was the result of an invitation by another social guest, who allegedly was negligent in supervising the child. Generally speaking, in this case, we have an emancipated-adult child who was granted authority by his father to exercise a certain privilege of the father. In exercising this privilege, the son allegedly committed a negligent act injuring a third party. The third party then attempted to impute liability for the alleged negligent acts of the son onto the father because the father permitted the son to use his privilege. However, the third party was a social guest to whom the father ordinarily only owed a duty to refrain from inflicting wilful or wanton injuries. *See* Syl. Pt. 9, *Jack.* Moreover, the injury occurred while exercising a membership right of the father to enter upon property owned by a homeowners' association to which the father belonged. The third party also is considered a social guest of the homeowners' association because the homeowners' association gratuitously allowed the third party upon its property for the third party's " 'own mere pleasure, convenience, or benefit.' " *McMillion,* 193 W.Va. at 303, 456 S.E.2d at 30 (citation omitted). However, if we would agree that agency theory applies to this situation, the father, and possibly the homeowners' association, may be held responsible for the negligent acts of the Fairchild, Jr., regardless of the fact that Stephen was a social guest. Upon careful review of the unusual facts of this case and extensive research on agency law, we do not believe this situation is the type in which agency principles should be applied.

As previously mentioned, we could find no cases directly on point with the situation at bar. The most analogous cases we can find are those involving the family purpose doctrine which applies in some automobile liability cases. Therefore, we look to those cases for guidance.

In *Freeland v. Freeland,* 152 W.Va. 332, 162 S.E.2d 922 (1968), *overruled on other grounds,* Syl. Pt. 3, *Lee v. Comer,* 159 W.Va. 585, 224 S.E.2d 721 (1976), we explained the family purpose doctrine is grounded on principles of agency or those of master and servant. 152 W.Va. at 336, 162 S.E.2d at 925. Under the doctrine, when a family member operates an automobile purchased and maintained for the family's "comfort, convenience, pleasure, entertainment and recreation," the family member who uses the automobile for such purposes is "regarded as an agent or servant of the owner...." *Id.* Consequently, if a family member operates the automobile in a negligent manner while pursuing a family purpose, the owner of the automobile will be liable for damages sustained by a third party which occurred as a result from the negligent operation. "Were not liability incurred by the owner of the automobile in such circumstances, an innocent victim of the

negligence of a financially irresponsible driver would be entirely without recourse." *Id.* In *Freeland,* we refused to condone such a result. *Id.*[13] Additionally, we stated in syllabus point two of *Freeland,* in part, that "[t]he owner of an automobile is liable under the family purpose doctrine for personal injuries sustained by a guest passenger as the result of the negligent operation of the automobile by an unemancipated minor son of the owner. . . ."

However, we have limited the family purpose doctrine in some situations. For instance, in *Bell v. West,* 168 W.Va. 391, 284 S.E.2d 885 (1981), a father loaned his truck to his son for his son's enjoyment and convenience. *Id.* at 392, 284 S.E.2d at 886. At the time, the son was living and working in New Jersey and merely was visiting his father in West Virginia. While using the truck to help a friend haul some furniture, the plaintiff fell from the back of the truck and sustained injuries. *Id.* at 391–92, 284 S.E.2d at 886. Under these facts, the trial court dismissed the action against the father with prejudice,[14] finding the father was not liable for the negligence of his son pursuant to the family purpose doctrine because his son had not lived in the father's house for a number of years. *Id.* at 392, 284 S.E.2d at 886. We affirmed the trial court's decision by referring to the reasoning of other jurisdictions which generally held a parent is not liable under the family purpose doctrine when an emancipated child, who is self-supporting and no longer resides with the parent, uses the parent's automobile. *Id.* at 394–95, 284 S.E.2d at 887–88 (citing, in part, *Platt v. Gould,* 26 Ariz.App. 315, 548 P.2d 28 (1976); *McGinn v. Kimmel,* 36 Wash.2d 786, 221 P.2d 467 (1950); *Clemons v. Busby,* 144 Ga. App. 207, 240 S.E.2d 764 (1977)).

Although the current case concededly is different from those applying the family purpose doctrine, there are some similarities which make those cases relevant. In the present case, the best that can be said in establishing an agency relationship is that Fairchild, Jr., was granted authority to use his father's membership rights at Flat Top to fulfill some family purpose by inviting social guests to join him on the property. It is clear from the record, Fairchild, Jr., was not using the rights of his father to accomplish some other business purpose on behalf of his father or, for that matter, as stated in part II(B), *supra,* any business purpose on behalf of Flat Top.

By analogy to the family purpose doctrine, it therefore could be argued that either an agency relationship existed between Fairchild, Jr., and his father, or the attempt to bring Fairchild, Sr., into the suit at least expands the pool from which Mr. Cole may collect a judgment in favor of the estate and the beneficiaries. However, at the time of the accident, Fairchild, Jr., was an emancipated-adult child who lived with his wife and his children. Fairchild, Jr., no longer resided with his parents. Comparing the unusual facts of this case to *Bell,* we, therefore, conclude Fairchild, Sr.'s, estate cannot be held liable for the alleged negligent acts of Fairchild, Jr., as Fairchild, Jr., and the victim of the alleged negligent acts were social guests in pursuit of their own enjoyment and pleasure under the auspice of Fairchild, Sr.'s, membership rights to use Flat Top's recreational areas. As in *Bell,* Fairchild, Jr., lived separately and apart from his father when the accident occurred and should be held responsible for his own negligent acts without the parties resorting to filing claims against Fairchild, Sr.'s, estate—where we find the best that can be said in favor of doing so falls under the guise of accomplishing some inchoate family purpose. We sim-

13. *See also Jones v. Cook,* 90 W.Va. 710, 111 S.E. 828 (1922) (adopting family purpose doctrine in this State for first time and giving similar rationale as expressed in *Freeland* ); cf. *Bartz v. Wheat,* 169 W.Va. 86, 90, 285 S.E.2d 894, 896 (1982) (stating, while agency principles may be useful in some circumstances to understand the family purpose doctrine, we are not constrained by agency labels where the real purpose of the doctrine is to better a plaintiff's chance of financial award).

14. We treated the dismissal as a summary judgment because the trial court considered matters outside the pleadings. 168 W.Va. at 392, 284 S.E.2d at 886.

ply do not find this reason sufficient to hold Fairchild, Sr., liable under agency principles. Therefore, we believe summary judgment was granted properly in favor of Fairchild, Sr.'s, estate.

## D.

### Contributory Negligence of Parents in Wrongful Death Action of Child

Flat Top and Fairchild, Jr., filed third-party complaints against Stephen's parents and Stephen's paternal grandparents, acting in loco parentis, in an attempt to implead them as third-party defendants. The trial court denied the motions, finding any alleged negligent supervision on the part of Stephen's parents or his grandparents is not actionable under the doctrine of parental immunity. Flat Top and Fairchild, Jr., argue the trial court erred in denying this motion. For the following reasons, we find the comparative negligence rule should be applied when a wrongful death action is brought against a third-party tortfeasor and when a parent's negligence proximately caused the death of a child and the parent stands as a beneficiary to the action.

We begin by recognizing that the doctrine of parental immunity prohibits a child from bringing a civil action against his or her parents. *Lee v. Comer,* 159 W.Va. at 587–88, 224 S.E.2d at 722 (1976). The underlying purpose of this doctrine is to preserve the peace and tranquility of society and families by prohibiting such intra-family legal battles. *Id.* at 588, 224 S.E.2d at 722. Additionally, it is said that the real purpose behind the doctrine "is simply to avoid undue judicial interference with parental discretion. The discharge of parental responsibilities ... entails countless matters of personal, private choice. In the absence of culpability beyond ordinary negligence, those choices are not subject to review in court." *Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 936 (Tex.1992).

Despite its purpose, however, the parental immunity doctrine is subject to several exceptions. For instance, in syllabus point two of *Lee* we stated: "An unemancipated minor may maintain an action against his parent for personal injuries sustained in a motor vehicle accident caused by the negligence of said parent and to that extent the parental immunity doctrine is abrogated in this jurisdiction." We later clarified our discussion in *Lee* to make plain that, although there may be some exceptions, the parental immunity doctrine remains a viable concept in West Virginia. *Courtney v. Courtney,* 186 W.Va. 597, 606, 413 S.E.2d 418, 427 (1991). In *Courtney,* we explained the exception carved out in *Lee* relates to automobile accidents where there usually is liability insurance. When a parent is insured, a suit brought by a child does not result in the family disharmony which the parental immunity doctrine is designed to prevent. Consequently, there is no reason to invoke the doctrine. *Id.*

Likewise, we found in syllabus point nine of *Courtney* that the parental immunity doctrine "is abrogated where the parent causes injury or death to his or her child from intentional or wilful conduct, but liability does not arise from reasonable corporal punishment for disciplinary purposes." In reaching this conclusion, we quoted the California Supreme Court which generally stated that, while it may appear improper under public policy to permit a child to sue a parent, it would be a much worse public policy to prevent a child from seeking compensation for damages caused by the child's parent's wilful or malicious infliction of personal injuries which fall outside the boundaries of reasonable discipline. *Id.* at 607, 413 S.E.2d at 428 (quoting *Emery v. Emery,* 45 Cal.2d 421, 429–30, 289 P.2d 218, 224 (1955)).

In light of the purpose of the doctrine and the exceptions we have carved out, we now turn to resolve the issue of whether the parental immunity doctrine prevents consideration of a parent's negligent acts, proximately causing the death of his or her child, when a wrongful death action is brought against a third party and an award derived therefrom may enure to the benefit of the parent as a beneficiary to the action. Based upon equitable principles of fairness, as well

as concepts underlying the doctrine of comparative negligence, we believe any parental negligence which proximately causes the death of the parent's child should be considered when determining the liability of a third party.

Initially, we recognize the espoused purpose of the doctrine of parental immunity is less forceful when a child dies and a wrongful death suit is brought. As a result of the child's death, the potential conflict between the child and the parent no longer exists. In addition, it generally is stated that a party should not benefit from his or her own wrongdoing, but, in cases like the present one, the parents are seeking compensation for the death without consideration of their own alleged culpability in proximately causing the death due to negligent supervision. We believe it would be inequitable for such a parent to collect the total amount of an award when the parent is found to be at least partially at fault.

In some draconian cases issued by this Court near the beginning of the twentieth century, we held parents were unable to collect for the death of their children when the parents consented or acquiesced to their children working in coal mines. We found the parents were contributorily negligent and barred them from any recovery because their children's employment violated certain statutes. *See Dickinson v. Stuart Colliery Co.,* 71 W.Va. 325, 329, 76 S.E. 654, 656 (1912) (stating "where the child is dead, and the father is . . . the beneficiary of any recovery, his negligence in consenting to and in becoming a party to the contract of unlawful employment, will bar recovery . . . unless the . . . death . . . was the result of defendant's willful or wanton act as the proximate cause"); *Swope v. Keystone Coal & Coke Co.,* 78 W.Va. 517, 520, 89 S.E. 284, 285 (1916) (finding "in the case of the death of a child by wrongful act, the negligence of the father or other person standing in loco parentis, contributing to his death, bars the right of action, if [such person] . . . is the sole beneficiary"); *Daniels v. Thacker Fuel Co.,* 79 W.Va. 255, 259, 90 S.E. 840, 842 (1916) (assuming boy was employed unlawfully, father, who knew and consented to employment, could not receive a recovery as son's sole beneficiary). Although, in light of the facts of these cases, we find the ultimate result harsh, we agree with them to the extent they say the wrongdoing of a parent should be considered in wrongful death cases involving a child when the parent stands to benefit from a recovery.

■ In other contexts, we have held a plaintiff's contributory negligence may be considered in assessing damages under our comparative negligence rule. In syllabus point three of *Bowman v. Barnes,* 168 W.Va. 111, 282 S.E.2d 613 (1981), we stated:

In order to obtain a proper assessment of the total amount of the plaintiff's contributory negligence under our comparative negligence rule, it must be ascertained in relation to all of the parties whose negligence contributed to the accident, and not merely those defendants involved in the litigation.

*See also Cline v. White,* 183 W.Va. 43, 45, 393 S.E.2d 923, 925 (1990) ("defendants are entitled to have a jury consider the fault of all the joint tortfeasors involved in the injury). We believe this rule also should apply to cases involving the wrongful death of a child where one of the beneficiaries is alleged to have negligently supervised the child and thereby played a role in the proximate cause of the child's death, and we find this decision is supported by a number of other jurisdictions.

■ According to 2 Stuart M. Speiser, et al., Recovery for Wrongful Death and Injury § 5:9 (1992), the comparative negligence rule frequently is raised as a defense and applied to wrongful death cases where one or both of the parents are alleged to be negligent. *Id.* at 5–44. In fact, in *Nelson v. Northern Leasing Co.,* 104 Idaho 185, 657 P.2d 482 (1983), the Supreme Court of Idaho found "a great majority of the jurisdictions permit the contributory or comparative negligence of parents to be raised as a defense in a wrongful death action brought by parents of a

deceased child." *Id.* at 484 (citations omitted). Additionally, the court found this same principle is applied in jurisdictions where parental immunity continues to exist. *Id.* (citations omitted). According to the court, the basic reason for permitting this defense is to prevent a tortfeasor from benefitting from his or her wrongdoing. *Id.* (citations omitted).[15] In deciding the case before it, the court determined the parental immunity doctrine does not prohibit "the negligence of the parents [from] be[ing] asserted as a defense in an action brought by the parents for the wrongful death of a child." *Id.* at 485.[16]

■ By reaching the same conclusion in the present case, we next are confronted with the problem of whether the negligence of one parent should defeat a claim of the other parent. We believe the best policy for this Court to follow already exists under our comparative negligence rule. In syllabus point three of *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979), we said: "A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." We find this syllabus point applied in conjunction with the distribution section of our wrongful death law, contained in West Virginia Code § 55-7-6 (1994), eliminates many of the problems other states have experienced in determining how to assess damages against parents in wrongful death cases where one parent is negligent and the other is not.[17]

■ Pursuant to West Virginia Code § 55-7-6, the jury and judge "may award such damages as to it may seem fair and just, and, may direct in what proportions the damages shall be distributed to" the listed beneficiaries. By treating each beneficiary separately and apportioning the damages, the trial court simply may apply our comparative negligence doctrine to the negligent parent.[18] If a parent's actions proximately caused the death of his or her child along with other third-party tortfeasors, the parent and other third-party tortfeasors may be held jointly and severally liable for the award.[19] There-

15. Moreover, as quoted by the court in *Nelson*, the Restatement (Second) of Torts § 496 (1965), provides:

"A parent is barred from recovery for harm to his legally protected interest in the services of his child if

"(a) the child is so young as to be incapable of effectively exercising self-protective care, and

"(b) the child's incapacity is a contributing factor in bringing about the harm or death, and

"(c) the parent has failed to exercise reasonable care to prevent the child from placing itself in a situation in which its lack of self-protective capacity may reasonably be expected to result in harm to it."
657 P.2d at 484 (quoting Restatement (Second) of Torts § 496 at 558).

16. For other cases permitting the negligence of a parent to be established in a wrongful death case of a child, see *Helton v. Reynolds*, 640 S.W.2d 5, 11 n. 2 (Tenn.App.1982) (stating "the parents being next of kin are the beneficiaries of the proceeds of any recovery and, consequently, a defense may unquestionably be based upon their negligence); *Bachman v. Lieser*, 289 Minn. 298, 184 N.W.2d 11, 12–13 (1971) (holding father, as trustee and potential beneficiary in wrongful death action of eleven-year-old son, suffered no prejudice by jury instruction stating father acted negligently if he did not use care of reasonable person in allowing son to ride motorbike on highway or instructing son in proper way); *Clark v. Sears, Roebuck & Co.*, 731 S.W.2d 469, 473 (Mo.App.1987) (finding where "parent brings an action in her own name for the wrongful death of her infant, the negligence of the parent that contributes to the casualty which produced the death can be assessed against the parent); see generally Annotation, *Contributory negligence of beneficiary as affecting action under death or survival statute*, 2 A.L.R. 785 (1948 & Supp.1985).

17. *See generally* Michael A. DiSabatino, Annotation, *Negligence of One Parent Contributing to Injury or Death of Child as Barring or Reducing Damages Recoverable by Other Parent for Losses Suffered by Other Parent as Result of Injury or Death of Child* 26 A.L.R. 396 (1983).

18. Thus, merely because one parent's negligence may "equal or exceed the combined negligence or fault of the other parties," the other parent still may recover. *See* Syl. Pt. 3, *Bradley*.

19. Of course, in this scenario, it will be necessary for the trier of fact to find the degree of fault of the tortfeasors. *Cf.* Syl. Pt. 7, *Kodym v. Frazier*, 186 W.Va. 221, 412 S.E.2d 219 (1991) (holding "[j]oint or concurrent tortfeasors who contribute

fore, we hold, in a wrongful death action, where one or both of the parents of a deceased child are found negligent in contributing to the death of such child, either the judge or the jury should apportion the damages between the parents and other beneficiaries, if any, and assess the relative liability of each tortfeasor in order to apply our comparative negligence rule.[20]

In sum, we explicitly state we make no finding with respect to whether the parents and grandparents were negligent. Such determination is better left to the trier of fact. *See* Syl. Pt. 2, *Wehner v. Weinstein*, 191 W.Va. 149, 444 S.E.2d 27 (1994) (stating "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them" (internal quotes and cites omitted)). Therefore, we remand this issue for such resolution.[21]

## III.

## CONCLUSION

For the foregoing reasons, we affirm, in part, and reverse, in part, the final order of the Circuit Court of Raleigh County. This case, therefore, is remanded for further proceedings.[22]

Affirmed, in part, reversed, in part, and remanded.

RECHT, J., sitting by temporary assignment.

to a plaintiff's injuries are jointly and severally liable for the entire injury. They are not entitled to have a jury weigh whose negligence caused what portion of the plaintiff's injuries").

20. Some courts express concern that the comparative negligence rule is an empty gesture if either a husband or wife is able to collect an entire wrongful death award for a child when the other spouse partially is at fault in a child's death. For instance, in *Stull v. Ragsdale*, 273 Ark. 277, 620 S.W.2d 264 (1981), the Supreme Court of Arkansas found most "non-community property jurisdictions ... have held that where the negligence of one parent combines with the act of a third person ... to cause injury to the parent's child that parent's negligence *is not imputed to the other parent* ... However, there are numerous jurisdictions which hold to the contrary." *Id.* at 266 (emphasis added; citations omitted). The court continued by saying some of the jurisdiction's which permit imputation of negligence from one spouse to the other do so by reasoning "the realities of the situation are that the negligent parent will undoubtedly share or jointly benefit in the full recovery by the other spouse, in spite of what may be substantial negligence on his or her part and thus benefit or profit from his or her own wrong." *Id.* at 267.

However, we find this rationale ignores the fact that parents are often divorced, as is the situation in the present case. Furthermore, un-

der our statute and our comparative negligence rule, we find this concern is diminished because each spouse is getting a separate award based upon their individual loss. Moreover, we believe it would be just as inequitable to deny a wrongful death beneficiary an award based upon the tortious conduct of another beneficiary as it would be to hold a negligent tortfeasor totally liable without any right to seek contribution from another negligent tortfeasor. We, therefore, will permit application of the comparative negligence rule to a parent whose own negligent acts contributed to the death of his or her child.

21. As to the issue of whether the parties can show negligence by failure of Stephen's mother to bring Stephen his chest protector, we find the trial court should reconsider this issue in light of our decision that parental negligence may be considered in a wrongful death case.

22. The parties raise a number of other alleged errors in their briefs, including, but not limited to, faulty jury instructions, improper juror selection, and an inadequate jury award. We carefully have reviewed each alleged error and find they either now are rendered moot by our above decision or are otherwise not meritorious. In closing, we mention that this opinion does not purport to address every issue which may arise at a new trial, and the trial court carefully should consider such issues as they are presented.