403 S.E.2d 406

**Charles R. MILLER**

v.

**MONONGAHELA POWER COMPANY.**

No. 19640.

Supreme Court of Appeals of
West Virginia.

Feb. 7, 1991.

Rehearing Denied April 24, 1991.

Carl N. Frankovitch, Frankovitch & Anetakis, Weirton, W.Va., for Charles R. Miller.

John B. Garden, Jeffrey A. Holmstrand, Bachmann, Hess, Bachmann & Garden, Wheeling, W.Va., for Monongahela Power Co.

Neely, Justice:

In 1970 the Homer Laughlin China Company, located in Hancock County, West Virginia granted a perpetual easement to Monongahela Power Company over approximately 3,600 square feet at its plant. The easement entitled Monongahela Power Company to construct a substation to supply Homer Laughlin with electricity. In 1971 Monongahela Power completed construction of the substation and put it in service. The purpose of the substation was to convert 25,000 volt incoming current to 2,400 volt outgoing current that could be used by Homer Laughlin.

Around Homer Laughlin's plant site, however, there were also located seven other substations that belonged to Homer Laughlin. These brick substations housed transformers that were used to convert Monongahela's 2,400 volt power to even lower voltages used in Homer Laughlin's plant itself. These substations carried no signs or other markings identifying them as Homer Laughlin's property, and Monongahela's substation contained no signs or markings identifying it as the power company's property.

The plaintiff in this case, Charles R. Miller, was hired by Homer Laughlin in 1978 as an "electrician." Mr. Miller was given a general orientation tour of the plant but was never instructed by Homer Laughlin concerning the location of its seven substations. At trial, Mr. Miller's supervisor testified that although the supervisor usually gave an orientation tour to new employees

in the electrical department during which he would point out the various substations, he did not specifically recall doing so when the plaintiff came to work.

Roughly five months after plaintiff was hired, plaintiff's supervisor instructed him to use an amp probe or ammeter to check the voltage on the "low side" of the transformer located in the Homer Laughlin No. 5 substation—the key to which hung inside one of Homer Laughlin's maintenance buildings. Plaintiff had never before performed this task, had never seen the No. 5 substation, and had never used the equipment needed to perform the test. Instead of going to the Homer Laughlin substation, plaintiff and a co-worker went to Monongahela Power's substation where they attempted to enter. But, as one might expect, the key to Homer Laughlin's substation would not open the padlock on the Monongahela Power substation. At this point, the plaintiff returned to his supervisor for further instruction.

Plaintiff's supervisor told the plaintiff over the telephone to try two other keys in the lock and, if these keys did not work, to use bolt cutters to remove the lock from the door. The plaintiff and his co-worker returned to the wrong substation (Monongahela's), unsuccessfully tried the additional keys, and then cut the padlock on the fence's gate in order to enter. Unlike the substation operated by Homer Laughlin, the Monongahela Power substation was not housed in a building, but rather was surrounded by a chain link fence which had a warning sign that read: "DANGER— KEEP AWAY." The gate to the fence was locked with Monongahela's padlock to which Homer Laughlin, of course, did not have a key.

Plaintiff had never worked around electricity at voltages higher than those typically found in a private house. Despite having no experience with high voltage electricity, plaintiff nonetheless attempted to climb a metal structure located within the substation. But instead of checking the "low" side of the substation, plaintiff climbed near the "high" side of the substation, which at the time was energized to

14,400 volts. When plaintiff came into contact with the energized line, approximately 12 to 15 feet above the ground, he received a severe electrical shock that ultimately required the amputation of his right arm. Plaintiff then sued both the Monongahela Power Company and his employer, Homer Laughlin.

Plaintiff's complaint against Monongahela Power contained two different theories of liability. First, plaintiff asserted a products liability claim against Monongahela Power alleging defective design and construction of the substation. Second, plaintiff claimed that the substation was:

"negligently and carelessly designed, manufactured, and installed by the defendant in numerous respects, including, but not limited to the absence of adequate warning signs and indicators to prevent an individual from inadvertently entering said 'substation' and coming into contact with energized portions thereof."

(Complaint, p. 2.)

Ultimately the trial court dismissed Homer Laughlin as a defendant because of employer's immunity under Worker's Compensation and held that plaintiff failed to state a claim for relief against the power company on his products liability theory. The case then went to trial on a simple negligence theory under which the plaintiff was allowed to prove that Monongahela had "induced" him to enter the substation by its failure to post signs identifying the substation as one owned by Monongahela Power.

Trial began on 19 June 1989, at which time the lower court granted the plaintiff's motion *in limine* and prohibited Monongahela from offering evidence or arguments concerning Homer Laughlin's role in causing the accident. The lower court allowed plaintiff and his co-employee to testify, over objection, that they would not have entered Monongahela Power's substation if it had been equipped with an identifying sign. At the conclusion of the trial, the Court instructed the jury, consistent with its ruling on the plaintiff's motion *in limine,* and over objection, that the jury

could not consider the possible fault of Homer Laughlin China Company or any other party as a factor in its deliberations.

Thus instructed, the jury returned a verdict in favor of the plaintiff for $1,200,000 for the loss of his arm. The jury apportioned negligence in the amount of 10 percent to the plaintiff and 90 percent to the Power Company. Counsel for the plaintiff prepared a judgment order awarding plaintiff $1,080,000, which the trial court entered on 26 June 1989. That judgment order expressly included an award of post-judgment interest, but did not include any award of prejudgment interest. The Power Company filed a timely motion for judgment notwithstanding the verdict or, in the alternative, for new trial on 5 July 1989. On 22 August 1989, the trial court denied the defendant's motion.

On 1 September 1989, plaintiff served a "Motion for Order Nunc Pro Tunc Pursuant to Rule 60(a)" citing this Court's decision in *Grove ex rel. Grove v. Myers*, 181 W.Va. 342, 382 S.E.2d 536 (1989), and sought to revise the trial court's judgment order to include an award of prejudgment interest on the entire amount of the verdict in the amount of $1,116,720. This figure represented interest at 10 percent from the date of injury, including even that portion of the verdict representing economic loss as to which interest had already had been included in plaintiff's expert's testimony. Plaintiff's counsel candidly admitted to the trial court that the parties had stipulated medical damages and plaintiff's economist had already included prejudgment interest

in his testimony. Nonetheless, the trial court, without opinion, entered the form order that had been submitted by plaintiff's counsel with the motion. Defendant then appealed to this Court.

## I

 Monongahela is outraged because it was held liable notwithstanding that West Virginia recognizes the common law distinctions among trespassers, licensees, and invitees.[1] In Syllabus Point 1 of *Morgan v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966), we said:

"A person is an invitee when for purposes connected with the business conducted on the premises he enters or uses a place of business." Point 1 Syllabus, *Burdette v. Burdette*, 147 W.Va. 313 [127 S.E.2d 249].

In Syllabus Point 2, we said:

"The owner or the occupant of premises owes to an invited person the duty to exercise ordinary care to keep and maintain the premises in a reasonably safe condition." Point 2 Syllabus, *Burdette v. Burdette*, 147 W.Va. 313 [127 S.E.2d 249].

Licensees, however, are owed a much lower duty of care. In the syllabus of *Hamilton v. Brown*, 157 W.Va. 910, 207 S.E.2d 923 (1974), we said:

Mere permissive use of the premises, by express or implied authority ordinarily creates only a license, and as to a licensee, the law does not impose upon the

---

1. In *Waddell v. New River Co.*, 141 W.Va. 880, 883–84, 93 S.E.2d 473, 476 (1956), we defined invitee, licensee, and trespasser:

The plaintiff was either an invitee, licensee or a trespasser. In the law of negligence, and with reference to trespasses on realty, invitation is the act of one who solicits or incites others to enter upon, remain in, or make use of, his property or structures thereon, or who so arranges the property or the means of access to it or of transit over it as to induce the reasonable belief that he expects and intends that others shall come upon it or pass over it. To constitute a person or licensee upon the premises or property of another, it must be shown that he is there by permission or authority of the owner or his authorized agent. The permission and authority amount-

ing to a license must be expressly or impliedly granted, and mere sufferance or failure to object to such person's presence upon the property of another is insufficient within itself to constitute a license, unless under the circumstances that permission should be inferred. A trespasser is one who goes upon the property or premises of another without invitation, express or implied, and does so out of curiosity, or for his own purpose or convenience, and not in the performance of any duty to the owner.

For an early discussion of the distinctions among invitees, licensees and trespassers, and the duty owed them by landowners, see *Woolwine's Adm'r v. Chesapeake & Ohio Ry. Co.*, 36 W.Va. 329, 15 S.E. 81 (1892).

owner of the property an obligation to provide against dangers which arise out of the existing condition of the premises inasmuch as the licensee goes upon the premises subject to all the dangers attending such conditions.

And, ordinarily, with regard to a trespasser, a possessor of property only need refrain from wilful or wanton injury. *Buckley v. Valley Camp Coal Co.*, 324 F.2d 244 (4th Cir.1963) (applying West Virginia law). We have consistently recognized and applied the distinctions for liability purposes among trespassers, licensees and invitees.

In the case before us, it is undisputed that Monongahela Power Company had not given plaintiff or Homer Laughlin permission for plaintiff to enter upon Monongahela's substation or climb on its structures. And, it is undisputed that plaintiff did not enter the substation in furtherance of any interest of Monongahela Power. Consequently, Monongahela argues, the lower court erred in failing to find, *as a matter of law*, that plaintiff was·a trespasser and entitled to no relief.

■ With regard to ordinary possessors of land, we enthusiastically reaffirm the common law distinctions among trespassers, licensees and invitees. Nonetheless, in a consistent line of cases stretching back over nearly a century, we have held that electricity is an inherently dangerous instrumentality and that its management requires a peculiarly high level of care. In this regard, although we have never gone so far as to make electric companies insurers, we have come reasonably close by making it clear that any deviation from the highest possible standard of care is sufficient to impose liability. In Syllabus Point 7 of *Sutton v. Monongahela Power Co.*, 151 W.Va. 961, 158 S.E.2d 98 (1967), we reaffirmed the rule of *Maggard v. Appalachian Electric Power Co.*, 111 W.Va. 470, 163 S.E. 27 (1932), that:

> "Those who operate and maintain wires charged with dangerous voltage of electricity are required to exercise a degree of care commensurate with the dangers to be reasonably apprehended therefrom; but they are not insurers against all inju-

ry therefrom." Pt. 1, syllabus, *Maggard v. Appalachian Electric Power Co.*, 111 W.Va. 470 [163 S.E. 27].

*Sutton, supra,* Syllabus Point 6. In Syllabus Point 1 of *Gault v. Monongahela Power Co.*, 159 W.Va. 318, 223 S.E.2d 421 (1976), we said essentially the same thing:

> An electric company which operates and maintains wires charged with dangerous voltage of electricity, though not insurers against all injury caused thereby, is required to exercise a degree of care, commensurate with the dangers reasonably foreseeable.

In Syllabus Point 3, *Lancaster v. Potomac Edison Co.*, 156 W.Va. 218, 192 S.E.2d 234 (1972), we stated, more specifically:

> "A company maintaining an electric line, over which a current of high and dangerous voltage passes, in a place to which it knows or should anticipate others lawfully may resort for any reason, such as business, pleasure or curiosity, and in such manner as exposes them to danger of contact with it by accident or inadvertence, is bound to take precaution for their safety by insulation of the wire or other adequate means." Point 2 Syllabus, *Love v. Virginian Power Co.*, 86 W.Va. 393 [103 S.E. 352 (1920)].

■ In the case before us, not only did the plaintiff demonstrate to the jury that the power company had no markings clearly identifying the substation as the property of the power company, but he also presented evidence from the defendant's own employee that the power company deliberately *refused* to use signs advertising power company ownership. In this regard, Mr. Cady, the distribution engineer for Monongahela, testified:

> "We have always felt, over the years, at least the 27 years that I have been there, and I think our experice [sic] has proved that we're better off not to say whose station it is. That leaves doubt in the minds of somebody who wants to go in there for some sort of purpose other than a qualified individual, maybe this isn't the right place. So, it's just been our policy not to do it."

(Rec. p. 745.) The plaintiff then introduced evidence of industry and OSHA standards concerning the size and content of appropriate warning signs. At the conclusion of trial, the jury were even instructed that if the accident was one that could not reasonably have been anticipated, the defendant could not be held liable.

We find that the plaintiff established a *prima facie* case of negligence because of the extraordinarily high duty of care owed by a power company to every member of the general public. We believe that the jury could reasonably have inferred that had the power company clearly and unequivocally identified its substation as the property of the power company, the plaintiff would not have cut the lock and entered upon the property. Indeed, cases in this state are legion where unsuspecting victims have come in contact with power company lines. *See, Gault, supra; Lancaster, supra; Love v. Virginian Power Co.,* 86 W.Va. 393, 103 S.E. 352 (1920); *Sutton, supra.* In each and every case the power lines were in place pursuant to a valid easement and the very act of coming in contact with them constituted a technical trespass. Therefore, we are doing no violence to our ancient and salutary common law rule that a possessor of property owes no duty to trespassers other than to avoid wilful and deliberate injury; in the power company cases, the extraordinarily high standard of care required to protect the public has always involved taking appropriate measures to keep the public away from high voltage.

Furthermore, in the case before us we have a danger that is eminently foreseeable. The power company knew the layout of Homer Laughlin's plant and understood that: (1) Homer Laughlin used substantial electricity that needed to be converted from higher voltages to lower voltages; (2) Homer Laughlin had its own power substations, albeit designed differently from Monongahela's; and (3) Monongahela's substation was entirely surrounded by Homer Laughlin's property and could reasonably be confused with the rest of Homer Laughlin's plant. Indeed, Monongahela Power's own employee testified that the Power Company *intentionally induced confusion about ownership* to discourage vandals and others who for some reason might wish to trespass on Monongahela's property.

## II

The defendant's second assignment of error is that the lower court should not have withheld from the jury the issue of Homer Laughlin's negligence. Although we believe that the trial court erred in ruling that the defendant could not argue the fault of Homer Laughlin, we find that under the facts of this case the error was harmless. The jury clearly found Monongahela to be at fault. The jury found the plaintiff 10 percent at fault and Monongahela 90 percent at fault; however, under joint and several liability, it makes no difference whether Monongahela was 90 percent at fault or 1 percent at fault as long as the plaintiff was not more than 50 percent at fault. *King v. Kayak Mfg. Corp.,* 182 W.Va. 276, 387 S.E.2d 511 (1989). In this jurisdiction "[a] plaintiff may elect to sue any or all of those responsible for his injuries and collect his damages from whomever is able to pay, irrespective of their percentage of fault." *King,* 182 W.Va. at 280 n. 8, 387 S.E.2d at 515 n. 8; *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982).

In the case before us we find that the trial court allowed all of the facts and circumstances surrounding the accident to be introduced into evidence. Although the court erred by not allowing Monongahela to point the finger at Homer Laughlin and argue to the jury that the exclusive cause of the accident was the combined negligence of the plaintiff and Homer Laughlin, nonetheless we know from experience that juries are not stupid. The court's Interrogatory No. 1 asked the jury:

"Do you find that defendant Monongahela Power Company was guilty of negligence which was the proximate cause of the plaintiff's injuries?"

To this question the jury answered "yes." We cannot imagine that if the jury conclud-

ed that Monongahela was 90 percent negligent under circumstances where Monongahela was prohibited from arguing the exclusive fault of Homer Laughlin, the jury would not have found Monongahela at least one percent negligent if Monongahela had been allowed to point the finger at Homer Laughlin all during trial. If the jury had found only a *de minimis* degree of negligence on Monongahela's part, the error would have been reversible, but in this case the question was not even close.

■ Along the same lines, Monongahela next argues that the lower court's rulings and instructions confound our explicit directive in *Bowman v. Barnes*, 168 W.Va. 111, 282 S.E.2d 613 (1981) concerning the role of an absent party in a comparative negligence case. Monongahela points out that we held in *Bowman* that "in order to obtain a proper assessment of the total amount of the plaintiff's contributory negligence ... it *must* be ascertained in relation to *all of the parties whose negligence contributed to the accident,* and not merely those defendants involved in the litigation." *Id.,* Syllabus Point 3, in part (emphasis added in appellant's argument).

> However, in *Bowman,* we also said:
> "Undoubtedly, there may be situations where the absent party cannot be brought into the suit ... because the party ... has the benefit of some immunity, such as ... the employer's defense of workmen's compensation. In these situations, it would appear to be unfair to preclude a consideration of the plaintiff's contributory negligence in regard to this absent party. To parallel the *Haynes'* rationale, the plaintiff should not be able to diminish his own contributory negligence by the inability to bring a particular party into the action."

Indeed, in the case before us the defendant was allowed to show *all* of the circumstances surrounding the accident and to argue to its heart's content the *plaintiff's own* contributory negligence. There is no way that the defendant could have augmented the plaintiff's contributory negligence beyond what was immediately obvious to the jury by arguing the fault of Homer Laughlin. The instruction to the jury that they should not consider the fault of any party not present in the suit was entirely proper.[2]

The issue in this lawsuit was whether Monongahela was negligent; the issue of whether Homer Laughlin was more negligent would merely have confused matters. Monongahela's point that it should have been allowed to argue that the accident was *entirely* the fault of plaintiff and Homer Laughlin and that Monongahela was as blameless as the driven snow is well taken, but the instruction directing the jury not to compare Homer Laughlin's negligence with that of the defendant was not error. All of the instructions, taken together, correctly directed the jury to the issue they were properly expected to decide, namely whether Monongahela was negligent.

■ Finally, in this general area of assigned error, Monongahela next argues that the combination of: (1) West Virginia's system of comparative negligence; (2) West Virginia's rules on joint and several liability; and, (3) West Virginia's statutory workers' compensation immunity violates federal due process and equal protection principles. Appellant makes an ingenious argument here, but cites no clear federal rule beyond the standard cases waxing eloquent in a general way about fairness, due process and equal protection.

In a nutshell, Monongahela's argument is that our decision in *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979) abrogated the common law contributory negligence rule so that now a partially negligent plaintiff may re-

---

**2.** Plaintiff's instruction number 2, given over objection, read as follows:

> You are only to consider the fault of the parties who are currently before the court. You are, therefore, instructed that you may not consider the possible fault of The Homer Laughlin China Company or any other person as a factor in your deliberations as to whether or not the defendant, Monongahela Power Company, is liable to the plaintiff. *Groves v. Compton* [167 W.Va. 873], 280 S.E.2d 708 (W.Va.1981).

cover. However, Monongahela argues, we did not abrogate the pre-*Bradley* rule regarding joint and several liability, particularly that part of the joint and several liability rule which allows a plaintiff to recover the entire judgment from one tortfeasor when the other tortfeasor is either insolvent or protected by statutory immunity. Thus, in a case where: (1) the plaintiff is 10 percent at fault; (2) a third party tortfeasor is 1 percent at fault; and, (3) the plaintiff's employer—who is shielded by worker's compensation immunity—is 89 percent at fault, the 10 percent negligent plaintiff recovers all damages from the 1 percent negligent third party tortfeasor. Thus, the power company argues, the system is morally outrageous because under the hypothetical circumstances outlined above, the plaintiff recovers notwithstanding that the plaintiff is ten times more at fault than the third party tortfeasor!

Indeed, this is a spectacularly good argument, but to accept it would require us to turn one hundred years of gradually evolving tort law on its head. As Justice Holmes once said, "The life of the law has not been logic: it has been experience." [3] Although the American tort system may still speak in terms of negligence and fault reminiscent of the 18th century, today the tort system is overlaid with implicit assumptions about spreading the risk of unavoidable accidents. If the federal courts wish to establish national uniformity on personal injury matters by rethinking the whole tort system and making clear, bright line rules of national application, no court would welcome such rules more hospitably than we. But, until such federal rules are articulated by the Supreme Court of the United States, we shall not presume to anticipate that august body's ruling on the subject. [4] Therefore, notwithstanding the novelty, ingenuity and even logic of Monongahela's argument, we decline to rewrite the entire tort law of West Virginia in one fell swoop based on supposed federal principles without explicit federal direction.

### III

■ The trial court permitted, over objection, the introduction of eight photographs depicting signs on various electric utility substations located in Ohio, West Virginia and Pennsylvania. Each photograph, taken within six months of the trial, depicted an electric utility substation with signs identifying the owner. Plaintiff did not purport to offer the photographs as substantive evidence, but rather for the stated purpose of illustrating his expert's testimony about how such signs might appear. Plaintiff offered no evidence that any of the substations depicted in the photographs had such signs at the time of the accident.

During closing argument, plaintiff's counsel used these photographs as "illustrative" evidence and repeatedly referred to the photographs to suggest that Monongahela Power had a duty to place similar signs on its substation in February, 1979. Plaintiff's counsel also referred to the testimony of plaintiff and his co-worker, admitted over objection, that they would not have entered the substation had it had signs such as those pictured.

Plaintiff's expert witness, Dr. Bartel, testified that the sign placed upon the substation by Monongahela Power did not meet the requirements of the National Electrical Safety Code. Dr. Bartel further testified that *at the time of the plaintiff's accident in February of 1979* a proper sign would have contained both identity of ownership and some indication of the magnitude of the voltage contained in the substation. Thus, the purpose of admitting the photographs about which the defendant now complains was to illustrate Dr. Bartel's testimony and give examples of warning signs that, in Dr. Bartel's opinion, complied with the National Electrical Safety Code as of the date of the plaintiff's accident.

■ Our general rule is that the admission of photographic evidence is within

---

**3.** O.W. Holmes, Jr., *The Common Law* (Boston: Little, Brown, 1881) p. 1.

**4.** *See*, for example, R. Neely, *The Product Liability Mess: How Business Can Be Rescued From State Court Politics*, The Free Press (New York, 1988).

the sound discretion of the trial court. *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986). Two major issues in this case were what constituted an appropriate warning and whether such warning should have been placed upon the substation to comply with the requirements of the National Electrical Safety Code. Plaintiff introduced evidence from experts that both industry safety standards and OSHA safety standards required the clear marking of high voltage substations; consequently, we find that the trial court did not abuse his discretion in allowing the photographs to be admitted into evidence. Demonstrative tangible evidence such as photographs can be introduced into evidence as an aid to understanding the witnesses's testimony. *Thrasher v. Amere Gas Utilities Co.*, 138 W.Va. 166, 75 S.E.2d 376 (1953), *appeal dismissed*, 347 U.S. 910, 74 S.Ct. 478, 98 L.Ed. 1067 (1954).

## IV

During oral argument in this Court, plaintiff's counsel admitted that there were substantial errors in the calculation of the prejudgment interest.[5] Specifically, the plaintiff's expert included a calculation for prejudgment interest in his testimony concerning special damages, but the trial court then added interest to the entire judgment. In effect, then, the trial court gave interest on interest. In addition, the trial court calculated all prejudgment interest at a constant rate of 10 percent from the date of the accident—February 16, 1979—to the date of the verdict—June 23, 1989. However, the award should have been calculated based upon a statutory rate of 6 percent from 16 February 1979 to 5 July 1981, and at a rate of 10 percent thereafter. *See Weimer–Godwin v. Board of Education of County of Upshur*, 179 W.Va. 423, 369 S.E.2d 726 (1988); *Bell v. Inland Mutual Ins. Co.*, 175 W.Va. 165, 332 S.E.2d 127 (1985), *appeal dismissed and cert. denied*,

474 U.S. 936, 106 S.Ct. 299, 88 L.Ed.2d 277 (1985).

Because these problems with interest were entirely mechanical, at oral argument the Court requested the parties to enter into a stipulation regarding prejudgment interest. Pursuant to that request, the following stipulation was entered into by the parties:

Now comes Appellee, Charles R. Miller, by his counsel, and also comes Appellant, Monongahela Power Company, by its counsel, pursuant to the court's supplemental requests and have prepared the following additional stipulations regarding prejudgment interest, based on the assumption that plaintiff is entitled to prejudgment interest on the entire verdict.

1) That deducting the prejudgment interest to which the plaintiff's economist testified would reduce the verdict amount from $1,200,000 to *$1,108,197.00.*

2) That reducing $1,108,197.00 by 10% for plaintiff's negligence results in a damages award of *$997,377.30.*

3) That prejudgment interest at the correct statutory rates on $997,377.30 is *$937,807.92.*

4) That the total judgment amount including prejudgment interest on the entire damages award would be *$1,935,-185.22.*

Here, the error of giving interest on interest appears clearly on the face of the record, and the amount of excess interest can be easily calculated. In such a case, the trial court should have avoided adding interest on interest, particularly because plaintiff's counsel candidly admitted that such a problem existed.

In *Grove ex rel. Grove v. Myers*, 181 W.Va. 342, 382 S.E.2d 536 (1989), we said that prejudgment interest under *W.Va. Code,* 56–6–31 [1981] is recoverable on special or liquidated damages, and that a special interrogatory should be submitted to

---

**5.** Defendant also argues that the Court's action in adding interest to the judgment was improper because the motion was not made within ten days of trial under Rule 59(e), *W.Va.R.C.P.* However, in light of our statute, *W.Va.Code*
56–6–31 [1981], requiring the trial court to add prejudgment interest, we find that moving under Rule 60(a) was correct because *the Court's* failure to add interest was an "oversight" on the part of the Court.

the jury for it to designate the amount of special or liquidated damages. We placed the burden of submitting a special interrogatory on the defendant when we said, "[w]hen this procedure is not followed and only a general verdict is returned, the plaintiff is entitled to prejudgment interest on the entire verdict containing special or liquidated damages in unspecified amounts." *Id.* 181 W.Va. at 348, 382 S.E.2d at 542.

The approach in *Grove* emerges from Syl. Pt. 3, *Kirk v. Pineville Mobile Homes,* 172 W.Va. 693, 310 S.E.2d 210 (1983), which involved fire damage to property, and the incidental annoyance and inconvenience:

> Where a general verdict is returned for loss or damage to real and personal property which includes an amount for loss of use arising from annoyance and inconvenience, the plaintiff is entitled to prejudgment interest on the entire amount of the general verdict unless the jury has by separate finding established an amount for such loss of use.

The rule of Syl. Pt. 3 of *Kirk, supra,* is one of narrow application, and the apparent extension in *Grove* of the rule was, thankfully, never made a syllabus point. Thus, we will not, in every case, refrain from sorting out prejudgment interest errors. However, our willingness to sort out such errors is entirely a matter of grace when a defendant fails to submit a jury interrogatory on special or liquidated damages and ends up owing prejudgment interest on a general verdict.

We elect to sort the pre-judgment interest problems out in this case because we do not find the errors were invited, and we find no evidence from the defendant contradicting the plaintiff's evidence on special damages which included the interest calculation. However, when defense counsel does something to confuse the issue and then seeks to assign error, or deliberately introduces convoluted and intricate argument about problems that could easily have been cured by a *Grove* special interrogatory, we will dismiss the assignment summarily.

We did not intend with our statement in *Grove* to create a trap for the unwary defendant and a jackpot for the silent plaintiff. Our job is not to bail careless defense counsel out of problems of their own making, but neither is it to provide a windfall for plaintiffs who sit by and allow the matter of damages and prejudgment interest to become hopelessly confused. Consequently, we would clarify the *Grove* rule here by adding that when the lawyers and the trial court can sort out the parts of a judgment on which interest should be added, even without the special interrogatories, the trial court should do so.

## V

Therefore, for the reasons set forth above, the judgment of the Circuit Court of Hancock County is affirmed in part and reversed in part and the case is remanded to the circuit court with directions to enter judgment in the amount of $1,935,185.22.

Affirmed in part, reversed in part, remanded with directions.