530 S.E.2d 701

**Kent A. GERVER and Billie Jo Gerver, Plaintiffs below, Appellants,**

v.

**Aurelio BENAVIDES, M.D., Defendant below, Appellee.**

No. 26355.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 5, 1999.

Decided Dec. 13, 1999.

Dissenting Opinion of Justice Maynard Dec. 16, 1999.

Concurring Opinion of Chief Justice Starcher Jan. 7, 2000.

D. Michael Burke, Esq., Burke & Schultz, Martinsburg, West Virginia, Barry J. Nace,

Esq., Paulson & Nace, Washington, D.C., Attorneys for the Appellants.

William Galeota, Esq., P. Gregory Haddad, Esq., Steptoe & Johnson, Morgantown, West Virginia, Ancil G. Ramey, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for the Appellee.

PER CURIAM:

In this appeal from the Circuit Court of Berkeley County, we are asked to examine a June 22, 1998 order that set aside a medical malpractice jury verdict in favor of the plaintiffs, and awarded the defendant physician a new trial. After a careful consideration of the briefs, arguments of the parties, and all matters of record, we conclude that the circuit court abused its discretion in setting aside the jury's verdict.

As set forth below, we reverse and remand the circuit court's order, and remand the case for entry of judgment on the jury's verdict.

I.

On October 7, 1994, the appellee and defendant below, Aurelio Benavides, M.D., performed a vasectomy on the appellant and plaintiff below, Kent Gerver, using a local anesthetic. During the procedure, Mr. Gerver testified that he suffered a sudden, sharp pain on the left side of his scrotum that "just felt like something was being ripped from [his] body."

The plaintiff testified that, subsequent to the surgery, the severe pain in his groin continued. The plaintiff consulted with doctors on 21 occasions in the 2 months after the vasectomy, seeking relief from the pain. Other specialists were consulted and procedures performed, and at the time of trial over 3 years later, Mr. Gerver testified that he was using the drug methadone to relieve the pain.

The plaintiff filed the instant action alleging that defendant Benavides was negligent in his performance of the vasectomy. After extensive discovery, the case was tried to a jury beginning on March 10, 1998.

Experts testifying on behalf of the plaintiff stated that the cause of the plaintiff's pain was most likely the defendant's placement of a suture through a nerve, and the defendant's failure to remove the suture. One of the plaintiff's experts testified that these actions by the defendant violated the standard of care. The plaintiff's experts also testified that, to a reasonable degree of medical certainty, the plaintiff's pain was likely to continue into the future.

The plaintiff, during the course of his testimony, emphasized the chronic, unrelieved pain in his groin that he continued to have since the vasectomy. In addition to taking methadone, the plaintiff testified that he had been subjected to various other surgical and therapeutic procedures to attempt to relieve the pain. The plaintiff also testified to his full-time employment holding two jobs, his wages, and his work-related benefits before the vasectomy, and his inability to sustain gainful employment afterward. The plaintiff testified to having severe pain during intercourse, and the plaintiff's wife, Billie Jo Gerver, testified as to her loss of consortium due to her husband's injury.

After 3 days of trial, on March 13, 1998, the jury returned a verdict finding that the defendant had been negligent in his treatment of Mr. Gerver. The jury awarded Mr. Gerver $2,118,431.11 in damages, and Mrs. Gerver $50,000.00 for her loss of consortium. On March 18, 1998, the trial court entered a judgment order on the verdict awarding the plaintiffs $2,168,431.11 plus $40,623.52 in prejudgment interest.

After the circuit court entered its judgment order, defendant Benavides filed several post-trial motions pursuant to the *West Virginia Rules of Civil Procedure*. A hearing on the motions was scheduled for May 11, 1998, but the defendant asked for and received a continuance. Then, on June 1, 1998, the defendant filed a motion pursuant to Rule 60(b)(3), seeking to set aside the trial court's judgment order on the ground of fraud. Included with the Rule 60(b)(3) motion was a video surveillance tape showing Mr. Gerver, his wife, and his children on a variety of occasions between March 28 and May 23, 1998. On the tape, Mr. Gerver can be seen performing such tasks as lifting a plastic lawn chair, sitting on a riding lawn

mower, operating a weedwacker, and bending over to pick up a piece of garbage.

The circuit court conducted a brief hearing . June 8, 1998 and heard the various motions made by the defendant. On June 22, 1998, the circuit court entered an order vacating the judgment and granting the defendant a new trial on two grounds.

The circuit court determined first, with respect to the sufficiency of the evidence, that the plaintiff's evidence relating to liability and damages depended largely upon the plaintiff's subjective description of his pain. The circuit court held that "the credibility of that claim is the absolute linchpin of the Plaintiff's case," and that the video tape "seriously call[s] into question that credibility[.]" The court found that the video tape "amounts to proof of misrepresentation." To "avoid a miscarriage of justice," the circuit court felt compelled to award the defendant a new trial.

Second, the circuit court questioned the plaintiffs' evidence of lost or impaired future earning capacity. The circuit court believed that "lost earning capacity had not been established with reasonable certainty." During the course of the trial, the circuit court had allowed an economist to testify on behalf of the plaintiffs concerning the amount of lost earning capacity sustained by the plaintiffs. After the economist testified, the circuit court excluded the testimony and instructed the jury to disregard any monetary figures suggested by the economist. The circuit court believed that the plaintiffs' failure to establish future lost earning capacity, combined with the economist's testimony, prejudiced the jury's verdict and was an additional reason warranting the granting of a new trial.

At the June 8, 1998 hearing, the circuit court gave no indication that it considered the hearing to be an evidentiary hearing, or

that the court was inclined to consider the surveillance video tape submitted by the defendant. Accordingly, the plaintiffs subsequently filed two motions to alter or amend the circuit court's June 22, 1998 order. In both of the plaintiff's motions, they asked the circuit court for an opportunity to present evidence to rebut the defendant's allegations.[1]

Both of the plaintiffs' motions were denied without a hearing. This appeal was then filed.

## II.

■ The appellants in this case ask that we examine the circuit court's June 22, 1998 order granting the appellee a new trial. As we have cautioned, the power to grant a new trial should be used with care, and a circuit judge "should rarely grant a new trial." *In re State Public Bldg. Asbestos Litigation,* 193 W.Va. 119, 124, 454 S.E.2d 413, 418 (1994).

> "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syllabus Point 1, *Andrews v. Reynolds Memorial Hospital, Inc.,* 201 W.Va. 624, 499 S.E.2d 846 (1997).

■ We review an order granting a new trial under an abuse of discretion standard. Syllabus Point 3, *In re State Public Bldg. Asbestos Litigation, supra.* "[W]hen a trial court abuses its discretion and grants a new trial on an erroneous view of the law, a clearly erroneous assessment of the evidence, or on error that had no appreciable effect on

---

1. Attached to the plaintiffs' second motion was a video tape of the plaintiffs' 8–year–old, 71–pound daughter, with her broken arm in a cast, handling the same weedwacker and carrying the same 8–pound plastic chairs carried by Mr. Gerver in the defendant's video tape. A report was also attached from Dr. John D. Justice who offered an opinion that nothing in the defendant's video tape showed that the plaintiff was not truthful in his reports of pain. Dr. Justice was apparently not informed of the nature of the plaintiffs' case, nor was he told whether he was reviewing the video tape for the plaintiff or defendant. Dr. Justice was asked by plaintiffs' counsel to review the tape (with the sound eliminated) as an exhibit in a fictitious case styled "Smith v. Jones."

the outcome, it is this Court's duty to reverse." *Tennant v. Marion Health Care Foundation,* 194 W.Va. 97, 106, 459 S.E.2d 374, 383 (1995). Similarly, this Court will reverse a circuit court order setting aside a jury verdict when a consideration of all the evidence clearly shows that the case was properly one for jury determination. *See, e.g.,* Syllabus Point 1, *Utter v. United Hospital Center, Inc.,* 160 W.Va. 703, 236 S.E.2d 213 (1977).

With these standards in mind, we examine the arguments of the parties.

## III.

### A.

*Evidence of Fraud or Misrepresentation*

■ The plaintiffs assert that the trial court abused its discretion in setting aside the jury's verdict, and that the circuit court was clearly wrong in its finding that the defendant's post-trial video tape of the plaintiff "amounts to proof of misrepresentation and sufficiently calls into question the credibility of the Plaintiffs as to merit a new trial in the interest of justice."

■ Under *W.Va.R.Civ.P.* Rule 60(b)(3) [1998],[2] a judgment may be set aside for fraud or misrepresentation discovered after entry of judgment. Fraud is defined as anything falsely said or done to the injury of property rights of another. Actual fraud is intentional, and consists of an intentional deception or misrepresentation to "induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Stanley v. Sewell Coal Co.,* 169 W.Va. 72, 76, 285 S.E.2d 679, 683 (1981). *See also, Hulings v. Hulings Lumber Co.,* 38 W.Va. 351, 372, 18 S.E. 620, 628 (1893).

■ We have also made clear the high burden of proof necessary to establish fraud. "Fraud is never presumed and when alleged it must be established by clear and distinct proof." Syllabus Point 5, *Bennett v. Neff,* 130 W.Va. 121, 42 S.E.2d 793 (1947). *In accord,* Syllabus Point 5, *Calhoun County Bank v. Ellison,* 133 W.Va. 9, 54 S.E.2d 182 (1949).

The surveillance video tape submitted by the defendant shows the plaintiff engaged in a variety of non-strenuous activities. The defendant asserts that the video tape impeaches the plaintiff's testimony that he suffers from continuous pain. The plaintiff, however, never testified at trial that he could not perform the activities shown on the video tape, and no evidence was submitted by the defendant to suggest that, prior to trial, the plaintiff represented that he could not perform these activities.[3] Nothing in the video tape contradicts the plaintiffs' testimony regarding the inception and duration of his pain, and the debilitating effect of that pain on his life.

■ Furthermore, we are also troubled by the circuit court's refusal to hold an evidentiary hearing to examine the plaintiffs' evidence submitted to refute the defendant's allegations. As we stated in the Syllabus of *Meadows v. Daniels,* 169 W.Va. 237, 286 S.E.2d 423 (1982):

> Where a Rule 60(b) motion is made to set aside a judgment and there is a conflict as to the facts on whether there is a ground to set aside the judgment, the trial court should hold a hearing to resolve the disputed facts and make some findings relative thereto.

The plaintiffs' video tape is inconsistent with the defendant's suggestion that the surveil-

---

2. *W.Va.R.Civ.P.* Rule 60(b)(3) [1998] states, in pertinent part:

   On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ...

3. The plaintiff's medical records, submitted to the jury, also support a conclusion that the plain-

tiff's pain did not preclude him from engaging in such activities as riding on a lawnmower or carrying a plastic chair. One physician's report indicates that the plaintiff "does not exhibit any particular impairments in range-of-motion, strength, reflexes or sensation which would preclude normal activities. However, he does exhibit severe pain behaviors with sitting, standing and moving about in general." Another report states that "[h]e is able to heel and toe walk. He is able to squat."

lance video tape constitutes clear and convincing evidence of fraud.

The defendant's surveillance video tape was presented to the circuit court as "newly-discovered evidence" of misrepresentations by the plaintiff,[4] and the circuit court found that the video tape discredited the plaintiff's testimony about his pain. As we have repeatedly stated, "[a] new trial on the basis of newly-discovered evidence will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Syllabus Point 2, in part, *State v. Stewart,* 161 W.Va. 127, 239 S.E.2d 777 (1977).

The circuit court in this case concluded that the defendant's surveillance video tape discredited and impeached the plaintiff's testimony. This was an improper basis for setting aside the jury's verdict, as Rule 60(b)(3) requires proof of intentional deception or misrepresentation by clear and convincing evidence. We therefore hold that the circuit court abused its discretion in awarding a new trial on the basis of fraud and misrepresentation.

### B.

#### *Lost Future Earning Capacity*

Damages for loss or impairment of earning capacity are a type of future damages. Syllabus Point 10, *Jordan v. Bero,* 158 W.Va. 28, 210 S.E.2d 618 (1974). In order to recover future damages, the permanency or future effect of any injury must be proven with reasonable certainty. Syllabus Point 9, *Jordan v. Bero.* In an injury case where the manifestations of the permanent injury are obscure, "positive medical evidence to a degree of reasonable certainty that the injury is permanent is sufficient to take the question to the jury and to support an award of damages for the future effects of such injury." Syllabus Point 13, *Jordan v. Bero.*

A litigant may prove the adverse future effect of an injury on earning capacity in two ways. First, a litigant may place

before the jury a specific monetary value on damages for lost future earning capacity. However, to do so requires expert testimony. We held in Syllabus Point 2 of *Liston v. University of West Virginia Board of Trustees,* 190 W.Va. 410, 438 S.E.2d 590 (1993):

> Where a plaintiff wishes to quantify the loss of earning capacity by placing a monetary value on it, there must be established through expert testimony the existence of a permanent injury, its vocational effect on the plaintiff's work capacity, and an economic calculation of the monetary loss over the plaintiff's work-life expectancy reduced to a present day value.

Second, a litigant may choose not to quantify the loss of earning capacity, but instead allow the jury to award a general amount of damages for lost earning capacity. To do this,

> ... the plaintiff must establish that there exists a permanent injury which can be reasonably found to diminish earning capacity. The plaintiff may then rely on lay or the plaintiff's own testimony to acquaint the jury with the injury's impact on his or her job skills. When this is done, the jury may assess a general amount of damages for diminished earning capacity[.]

*Liston,* 190 W.Va. at 414, 438 S.E.2d at 594.

In case *sub judice,* the evidence presented by the plaintiff to prove damages comports with the latter route. During the course of the trial, the plaintiff's physicians testified to the permanence of the plaintiff's injury, and one testified that the effects of the injury were "crippling" to the plaintiff. One physician testified that nothing further could be done surgically for the plaintiff which would reduce or eliminate his pain. Furthermore, plaintiff Kent Gerver testified that, because of his chronic pain and his dependence on methadone to function, he was unable to return to gainful employment. The jury was presented with records showing the plaintiff's past wages and benefits (such as health insurance); with evidence that the plaintiff could no longer earn these wages and benefits; and with evidence that the plaintiff was

4. Counsel for the defendant described the surveillance video tape during the hearing on the Rule 60(b)(3) motion in the following way: "Your Honor, this goes to something other than

the damages in the case, it goes to the credibility and reliability of the very accounts on which the entire case from Plaintiffs' perspective was presented."

a 34 year-old-man with a life expectancy of 41.4 more years.[5]

The plaintiff introduced evidence through his physicians such that a jury could find, to a reasonable degree of certainty, that the plaintiff suffered from a permanent injury. The jury could also find that the plaintiff's injury eliminated his future earning capacity, and had before it, without objection by the defendant, documents that would allow it to quantify the plaintiff's future lost earning capacity.

During the course of the trial, the plaintiff also offered the testimony of an economist, Dr. Richard Lurito, in an attempt to quantify the amount of lost future earning capacity sustained by the plaintiff. *See Liston,* Syllabus Point 2, *supra.* The defendant apparently objected to Dr. Lurito's testimony, arguing that the plaintiff had failed to establish through a vocational expert the specific effect the plaintiff's pain would have on his future earning capacity. The trial court allowed Dr. Lurito to testify, and instructed the jury that the court was reserving the question of the admissibility of Dr. Lurito's testimony until later in the trial. The trial court subsequently determined that it was error to allow Dr. Lurito to quantify the plaintiff's lost future earning capacity, and instructed the jury to disregard his testimony.

The record does not contain Dr. Lurito's testimony, and we therefore do not decide whether the circuit court erred in striking his testimony. However, even in the absence of Dr. Lurito's testimony, we find evidence sufficient to support the conclusion that, to a reasonable degree of certainty, the plaintiff's future earning capacity was impaired by his injury. Furthermore, without objection by the defendant, the jury was presented with evidence of Mr. Gerver's earning capacity prior to the vasectomy.

We therefore find that the circuit court abused its discretion in granting a new trial on the erroneous basis that the plaintiff had failed to prove lost future earning capacity, or that the testimony of the plaintiffs' economist prejudiced the outcome of the trial.

### C.

#### Cross–Assignment of Error

■ During the course of the trial, the defendant did not object to the circuit court's definition of "general damages" in the jury instructions and or to the list of "general damages" contained in the jury verdict form. More specifically, the defendant did not object to the circuit court's jury instructions which merged certain economic and non-economic damages together under the heading of "general damages." [6]

The circuit court instructed the jury that it could return a verdict for "general damages," defined by the circuit court as including "[m]edical expenses in the future," "[p]ast and future physical pain and suffering," "[l]oss or impairment of future earning capacity and benefits," and "[l]oss of the capacity to enjoy life and to function as a 'whole man.'" The verdict form included a single line for the jury to assess a single, lump sum as "general damages," to which the defendants did not object.

The jury returned a verdict of "general damages" of $2 million.[7]

---

**5.** It also appears that the plaintiff has been found to be permanently, totally disabled by the Social Security Administration.

**6.** Counsel for the defendant did appear to make an objection to including "benefits" as a form of *special* damages, alleging that there was no evidence introduced by the plaintiff regarding lost "benefits." The defendant also objected to the inclusion of future medical expenses on the verdict form, again contending that the plaintiff introduced no evidence of future medical expenses. There is no indication as to the trial court's discussion or ruling on these objections in the trial transcript.

**7.** As to the damages awarded by the jury, the verdict form states:

4. We the jury, upon the issues joined, find for the Plaintiff Kent Gerver and award him the following SPECIAL DAMAGES:

| | |
|---|---|
| For medical expenses to date: | $ 30,301.52 |
| For lost wages and benefits to date: | $ 88,129.59 |

5. We the jury, further find, with regard to GENERAL DAMAGES including the following categories:
— For medical expenses in the future; and

In the defendant's cross-appeal, the defendant now insists that the jury's award of $2 million in "general damages" in this case exceeds the $1 million "cap" on non-economic damages established by *W.VA.Code*, 55–7B–8 [1986]. The defendant asks that we reduce the "general damages" portion of the verdict to $1 million.

This Court has held on several occasions that when a litigant seeks to make procedural distinctions between "special" damages and "general" damages, that litigant bears the burden of insuring that the circuit court distinguishes between types of damages in the jury's verdict form. *See, e.g., Grove By and Through Grove v. Myers,* 181 W.Va. 342, 382 S.E.2d 536 (1989). In Syllabus Point 7 of *Miller v. Monongahela Power Co.,* 184 W.Va. 663, 403 S.E.2d 406 (1991), we made clear that "when the defendant fails to submit a special jury interrogatory asking the jury to set forth special or liquidated damages, this Court's attention to such errors is entirely a matter of grace[.]"

Both the jury instructions and the jury's verdict form merged "special," economic-type damages, such as lost future wages and employment benefits and future medical expenses, with "general," non-economic-type damages, such as past and future pain and suffering and loss of capacity to enjoy life. The defendant did not object to the circuit court's instructions or verdict form, and did not submit special interrogatories that would allow the jury to segregate "economic" from "non-economic" losses. As there is no means to determine whether the non-economic damages assessed by the jury exceeded the $1,000,000 statutory limit, this Court will not presume that error occurred.

We therefore find no merit to the issue raised in the defendant's cross-appeal.

— For past and future physical pain and suffering and mental anguish; and
— For loss or impairment of future earning capacity and benefits; and
— For loss of capacity to enjoy life and to function as a "whole man:"    $2,000,000.00

## IV.

As set forth above, we reverse the circuit court's June 22, 1998 order granting a new trial, and remand the case for entry of judgment upon the jury's verdict.

Reversed and Remanded.

Judge ROBERT B. STONE, sitting by temporary assignment.

Justice SCOTT did not participate in the decision of the Court.

MAYNARD, Justice, dissenting:
(Filed Dec. 16, 1999)

I dissent because I do not believe the trial court abused its discretion in setting aside the jury's verdict and awarding a new trial based upon fraud.

God forbid that a trial actually be a search for the truth! Even though that is precisely what a trial should be, that is not how we currently think about trials. If you want an eye-opening test of public perception about the justice system, go out on the street and simply ask the first ten people you encounter if they think a trial today is a search for the truth and see what answers you get. In this case, thanks to the use of a video camera, however, the trial court below discovered the truth. Unfortunately, a majority of this Court is not happy with the discovery. Consequently, the majority manipulated some arcane points of law to reinstate a verdict in excess of two million dollars to a plaintiff who most likely is guilty of perpetrating a fraud on the trial court.

The verdict below was set aside and a new trial awarded after the trial court viewed the demeanor of the appellant, Kent Gerver, on surveillance videotape. The trial court found that the appellant's demeanor on videotape contrasted markedly with the appellant's demeanor at trial. According to the trial court, during trial, "Kent Gerver moved about the

6. We the jury, with regard to the issue of CONSORTIUM do find for the Plaintiff Billie Jo Gerver and award the following DAMAGES:
$    50,000.00

**TOTAL DAMAGES**    $2,169,431.11

courtroom gingerly, projecting very obvious discomfort and pain. When he testified he unsuccessfully fought back tears as he described the devastation this pain had wreaked upon his life, his family, his relationship with his wife." Specifically, the appellant testified that, as a result of his injury, his life was reduced to feeding his dog, taking short walks, reading the newspaper and watching television. The appellant's wife testified that she and the appellant no longer socialize because the appellant wants to be alone most of the time. The surveillance videotape, in stark contrast to his testimony, shows the appellant weed-whacking, lawn-mowing, attending sporting events, carrying objects, climbing bleachers and allowing small children to sit on his lap. Accordingly, the trial court concluded that "[t]he person depicted in the video and the person the Plaintiff represented himself to be, through his words and actions before the jury, are two different persons." The Court's rejection of this videotape evidence is especially troubling when one considers that the appellant's entire case was almost wholly predicated on his demeanor and subjective complaints of pain.

Further, while this Court could view the surveillance videotape contained in the record, it did not see the appellant's demeanor at trial. The trial court, on the other hand, watched the appellant's behavior throughout the trial and compared it with the contents of the videotape. Obviously, the trial court is in the better position to determine whether the surveillance videotape amounted to proof of fraud. Accordingly, there is absolutely no sound legal reason for this Court to second-guess the determination of the trial court under the facts of this case.

This is a case in which the appellant was awarded $2,168,431.11, not including prejudgment interest, for subjective evidence of pain later shown to be fraudulent. So not only will we allow the appellant to present a fraudulent picture to a jury, we will give him a two million dollar reward for so doing.

Based upon the evidence of fraud and other error, the trial court quite properly vacated the verdict and awarded a new trial. There is no reason to reverse this judgment. Accordingly, I dissent.

STARCHER, Chief Justice, concurring:

(Filed Jan. 7, 2000)

I concur with the majority, and believe that the circuit court overstepped its bounds in this case by setting aside the jury's verdict. The parties in this case fought hard on the issue of liability—plaintiff Kent Gerver contended that defendant-doctor Aurelio Benavides breached the standard of care, and the defendant responded that while something may have gone wrong during the vasectomy, the procedure was performed normally and within the standard of care exercised by doctors performing vasectomies.

The key here is that the defendant acknowledged that *something* went wrong with plaintiff Kent Gerver's vasectomy. The fight during the trial was over whether the defendant was at fault for what went wrong. The defendant suggested that adverse results happen when surgery is performed. Infections occur, wounds don't heal properly, scarring forms that causes pain, or the plaintiff may have had some other medical problem that was causing his pain. Something went wrong, and the jury had to sort out if the defendant was responsible.

What the defendant never really disputed was *how far* things went wrong. Counsel for the defendant pretty much conceded that the plaintiff was in a lot of pain. Counsel for the defendant never even requested their own medical examination of the plaintiff, or their own functional capacity test to see if the plaintiff's problems were that severe. Counsel for the defendant put all their eggs in the liability basket. They gave no attention to the issue of damages. In fact, it appears that they offered no evidence regarding the plaintiff's damages.

So when the jury decided that the defendant doctor *was* responsible for the plaintiff's injury, the jury merely looked at the evidence provided by the plaintiffs' counsel to figure out how much money to award the plaintiff. The record contains Mr. Gerver's entire employment file detailing his job as a machinist for General Electric, making over

$35,000 a year. It also details the extensive pension benefits he could have received from the company had he not been forced to quit working, and shows that he would have to pay $449.00 per month to continue providing health insurance for himself and his family. The jury was also given detailed lists from numerous drug stores showing the pain-killing drugs purchased by the plaintiff in the past, and the cost of those drugs now and in the future.

And from what I can tell in the record, the defendant never objected to the admission of any of these records. The jury took these records into the jury room when they deliberated.

The jury also heard how the plaintiff walked with pain, sat for long periods with pain, couldn't have intercourse without pain, went from being a machinist at work to sitting at an assembly line packing boxes with a bag of ice in his lap, and later having to stop working because his drug dosage made him unsafe to work around. The jury also heard how he was clinically depressed because of the disastrous impact the pain had on his life.

The jury was therefore not operating in the dark on the issue of damages. The jury worked with what it had, and it had a lot.

The record suggests that the plaintiff offered to settle the case for an amount within the defendant's policy limits, and apparently for an amount well under $2 million. The defendant gambled, believing that he would receive a jury verdict, but he lost.

It was only after the circuit court entered its judgment order that counsel for the defendant began his discovery on the issue of damages. Counsel for the defendant claims that some concerned (probably disgruntled) citizens were upset that the jury awarded Mr. Gerver such a significant sum of money, and called to tell the defendant that the plaintiff was in nowhere near $2.2 million worth of pain. Mind you, these concerned

citizens weren't sitting on the jury, and didn't hear the evidence that the jury heard.

So, the defendant hired a post-trial private investigator to follow the lead provided by these "concerned" citizens, and the private investigator proceeded to spy on the plaintiff with a video camera in hand. Much of the videotape taken by the investigator contains footage of the plaintiff sitting in a chair. Sitting in bleachers. Sitting on a riding lawnmower. Shuffling to throw away a piece of trash. Bending over to look underneath a car. And lots of footage of the plaintiffs' son playing baseball. Nothing really remarkable.[1]

Contrary to the suggestions made by my dissenting colleague, the videotape does *not* show the plaintiff doing gymnastics, or doing splits, or springing about—you should see it! It shows a man obviously in some discomfort, moving very slowly, shuffling about with his family. Shuffling with a weedwacker strapped over his shoulder. Shuffling with plastic chairs in hand that weigh a whopping 7 to 8 pounds. Sitting with his hands tucked between his legs, protecting his "parts." All while under the effects of methadone.

The circuit court felt that the videotape contradicted Mr. Gerver's courtroom testimony, because Mr. Gerver apparently was in great discomfort during the trial, shuffled to the witness stand, and cried when he described his pain. I agree that a trial judge is the best witness of a witness's demeanor, and for that reason this Court usually is highly deferential to a trial judge's decision to grant a new trial.

But the circuit court, in the transcript of the June 8, 1998 hearing, admitted that it didn't have a transcript of the trial, and that fact is important. The trial transcript reveals that Mr. Gerver testified that *he had reduced his dosage of methadone* to help him to testify more clearly. The circuit court apparently never considered this factor when considering why the plaintiff's demeanor was different during trial than on the surveillance videotape. More importantly, the circuit

---

1. Actually, the footage made the hair on the back of my neck go up. To think that for 2 months, a private investigator sat around filming Mr. Gerver wherever he went—and if he couldn't film Mr. Gerver (because he wasn't around), he filmed Mrs. Gerver, or their children—it somehow seems almost subversive—un-American.

court only looked at the defendant's controversial, disputed video tape evidence, without giving the plaintiffs the opportunity to present rebuttal evidence, contrary to our holding in the Syllabus of *Meadows v. Daniels,* 169 W.Va. 237, 286 S.E.2d 423 (1982).

The circuit court seems to have never looked at the plaintiff's video tape, which shows the plaintiff's 8–year–old daughter, with her broken arm in a cast, carrying the same chairs and using the same weedwacker used by Mr. Gerver in the defendant's surveillance video. The defendant's surveillance video might have been useful evidence had it been produced prior to trial, which it could have been. By "useful," I mean it might have assisted the jury in its determination of Mr. Gerver's credibility. But, as the majority points out, newly discovered evidence affecting only credibility cannot be the basis for a new trial.

The jury's verdict—hard fought for by the plaintiff—is supported by the evidence. Counsel for the defendant simply dropped the ball, and didn't think damages were that big an issue during discovery. The defendant thought damages were important after the trial, but could only come up with the ridiculous surveillance videotape—which, when viewed with a careful eye, supports the jury's verdict!

To discredit this verdict is to discredit our American jury system, a jury system in which many of our citizens participate each year.

For all of its defects, the jury that our ancestors fought so hard to attain is a remarkable institution. What it actually means is that we have decided to give the ultimate say-so in our justice system to a diverse group of ordinary citizens—our fathers and mothers, our sisters and brothers, our co-workers, and our friends. We have decided that it is better to place our faith in the common-sense of ordinary citizens than in a trained class of professional jurors.

As a trial judge for 20 years, and as an appellate judge for an additional 3 years, I have watched many juries work, and I share this faith more than ever. I believe that justice is too important to be left to lawyers and judges alone. Justice must remain in the day-to-day hands of ordinary people. This is a an extraordinary idea, deeply rooted in our past—an idea and a history of which we can be proud. It is an idea that—if we stick with it—can give us optimism and confidence for the future.

I believe that the circuit court clearly abused its discretion in granting a new trial, and therefore concur in the majority's opinion.